Judge Marshall
delivered the Opinion of the Court.
In May, 1803, the County Court of Madison granted to James Hare, a certificate for four hundred acres of land, under the act of assembly for settling and improving the vacant lands of the Commonwealth, located to begin at a designated point on a certain fork of Goose creek, and “running down said fork on both sides for quantity, so as to be in a square, and to include the creek in the middle of the upper and lower lines.”
On the 9th of April, 1814, a survey was executed on this certificate, by which the four hundred acres was run off in a rectangular parallelogram, having its greatest length across the creek, and including only two hundred and twenty-six acres of the land described in the certificate.
On th 13th of May, 1814, a second survey was executed, on the same certificate, laying off the four hundred acres in a square, and conforming to the calls of the cer *142 tificate, except so far as a variation may have been produced by inaccuracy of measurement.
On the 19th day of December, 1821, a patent issued to Martin D. and Mark Hardin, for four hundred acres, according to the first of these surveys—the Hardins having become the purchasers of Hare’s claim, at the register’s sales thereof, for the non-payment of the state price; at the first of which, in 1813, Martin D. Hardin purchased the land, and at the second, in 1814, it was purchased by Mark Hardin, who afterwards admitted Martin D. to an interest of two thirds, in which proportion it was granted to them by the patent.
The two surveys were made under the immediate direction of John Bates, the agent of M. D. Hardin.
In December, 1820, Alexander White and John Wilkerson entered into a contract with the Hardins; in which, after a recital that the Hardins hold four hundred acres of land granted by the Madison County Court to James Hare, in 1803, and that White and Wilkerson wish to make an experiment thereon for salt water &c. the Hardins bind themselves to convey the land to them, on the receipt of two thousand five hundred dollars, in five annual instalments, with interest from the date of their erecting a furnace for making salt on the land. But a right is reserved to the said White &C. after making the experiment, to abandon the purchase, or to elect to pay the money and take the land; or, without paying any thing for the land, to admit the Hardins into partnership, and become joint owners of the land and salt works, and joint contributors to the future expenses of the business. The experiment to be made before the first day of January, 1826.
On the 25th day of May, 1824, White &c. by their attorney, notified the Hardins that they elected to take a conveyance of the land on the terms of the agreement of December, 1820: whereby they became bound to pay the sum of two thousand five hundred dollars, in five equal annual instalments, with interest from that date.
After all of the instalments had become due, and there had been some fruitless negotiation between the parties, in regard to alleged difficulties in the title, judg *143 ment was obtained against White, for so much of the purchase money as remained unpaid, with interest thereon, amounting in all to upwards .of three thousand dollars. To enjoin which, the present bill was filed, in 1832, by White and Wilkerson, against Mark Hardin, the representatives of Martin D. Hardin, then deceased, and the heirs of James Hare, then also dead — alleging want of title in the vendors, as to the whole or a part of the land, and praying for a conveyance, so far as the vendors have right, and a rescission as to the residue.
Land held under a settlement and county court certificate; the state price not being paid, the register sells the land: query, as to the effect, if the party whose right was sold was dead. He being alive, the purchaser became owner of the certificate, and liable for the future instalments: his death afterwards and before the land was redeemed, could have no effect upon any future sale of the land: his heirs can support no claim to it.
Allegation that the land was sold when there was nothing due the state for it—not supported by proof.
An act passed dividing the amount due the state for land into instalments; a receipt for a ‘first instalment’ dated after the act passed, is no evidence of the payment of any instalment for which the land had been previously sold.
The ability of the Hardins to convey, according to their contract, is questioned on two grounds: the first o: which is, that notwithstanding their purchases at the sales for non-payment of the state price, and the grant of the land to them by patent, the heirs of James Hare, or others claiming under them, are entitled in equity to at least two thirds of the land; and those heirs set up claim accordingly, in their answer and cross bill. On this branch of the subject it is alleged.
First—that James Hare was dead before any of the sales for the state price, and therefore the sale of his right was void. But the fact alleged is denied; and it is not proved that Hare died before the first sale. To whatever effect his death before the first sale, might have been entitled — and this it is not necessary to decide— it seems to us that, as by that sale, supposing it to have been valid, the purchaser stood as the proprietor of the certificate, and liable for the state price, the death of the original proprietor occurring between that and any sub-sequent sale, while the land was unredeemed, could have no effect upon the subsequent sale.
Second. It is further alleged that, the second instalment for which the land was first sold, was not due; that the first instalment was paid by Hare himself, as evidenced by the register’s receipt for the first instalment, dated the 14th day of May, 1808; and that a sum more than equal to one instalment had been previously paid by Martin D. Hardin, for Hare, and had not been cred *144 ited; and the auditor’s receipt for ten dollars, paid in November, 1805, is referred to, as proving that, at least enough to cover two instalments had been paid before the sale in 1813. But admitting that the receipt of May, 1808, is genuine—which is denied by the answer—still the facts do not authorize the conclusion drawn from them. By the act of December, 1806, for regulating the payment of the debt due to the Commonwealth for lands, so much as was then due or to become due for any tract of land, was directed to be divided into twelve equal annual instalments, to be paid on the 1st day of December in each year, &c. Of course, what had been previously paid, was not to be included in any of these instalments; and the subsequent receipt of 1808, for seven dollars twenty-four cents, paid by Hare, as the first instalment, must be understood to be for the first of the twelve instalments authorized by the act just referred to (as is evident both from its date and amount,) and furnishes no presumption whatever, that the previous payment of ten dollars by Hardin, had not been credited, and deducted from the whole amount originally payable, before the division of the sum remaining due into instalments. Nor does the gross amount of payments, as exhibited in this record, furnish ground for any such presumption. This allegation is, therefore, wholly unsupported.
A, holding a grant of land, on which most of the state price remained due, sells ⅔ of it to B, who agrees to pay ⅓ of the price, to the state, and does pay his part of the instalments; but A neglecting to pay his part, the land is sold by the register, and purchased by B; other instalments becoming due, the land is again sold, and purchased by C, who afterwards, transfers ⅔ of his interest to B: if the land had been sold through B’s default, his purchase of it would have enured to the benefit of A as well as himself; but as the sale was through A’s own default, to be reinstated upon refunding his share of the purchase money, would be as much as he could expect; that not done or offered, B was not bound to hold the land, or pay further instalments on it; and when it was sold to a stranger, without fraud, all title & right on A’s part was completely divested: he can have no claim on B, in consequence of any subsequent purchase of the same land by him.
*144 Third. It is further alleged that, before any of these sales, Martin D. Hardin was bound by contract to pay a moiety of the state price for the four hundred acres; and was to be entitled to a fourth of the land. But that Hardin, though requested by Hare’s agent, refused to pay his part of the price, stating that he wished to have the land sold for non-payment; and it is charged that, the sales which took place, were the consequence of Hardin’s failure to perform his contract, and of a combination to defraud Hare. These allegations are denied by the answers, and there is no proof in relation to them, except that which is furnished by the two receipts above referred to, and the answer of Mark Hardin and its exhibits.
From these it appears that, about the time the certifi *145 cate was granted to Hare, he executed his bond to M. D. Hardin for one third of the four hundred acres, as soon as a deed could properly be made for it, and undertook to do all that was necessary for perfecting the title; and that Hardin, by a memorandum on this obligation) and which, after his death, was found among his papers, acknowledged himself bound to pay one third of the expense of getting the title. The receipt of 1805 shows that he paid ten dollars, which was the first money paid; and there is no evidence, except the receipt of 1808, that Hare ever paid, or offered to pay, any thing. That receipt, as already noticed, is denied by the answer, and its genuineness is not proved. But supposing it to be genuine, it still leaves Hare in arrears in the payment of his part of the state price; and after having remained so until 1813, he had no right to complain that Hardin did not save the land from sale by making payment for him.
It is contended, however, that, in consequence of the relation existing between Hardin and Hare, with respect to the land, the purchase by Hardin at the first register’s sale, did not extinguish the right of Hare, but that a Court of Chancery would follow and protect it in Hardin’s hands; and that, as after .the second sale, Hardin again acquired an interest, that interest should, on the same principle, be held subject to Hare’s right. If the first sale had been caused by the failure of Hardin to pay his proportion of the price, according to his obligation to Hare, his purchase at that sale might have been regarded in equity as enuring to the joint benefit, and is in effect placing the parties as they were before, in regard to the title to the land. And if Hardin had been bound still to make further payment for the joint benefit, and the second sale was a consequence of his breach of that obligation, his subsequently acquired interest from Mark Hardin, the purchaser at the second sale, might have been held subject to the equity of Hare; and especially if the second sale had been, as charged, a contrivance betwen the Hardins, to injure Hare. But as the first sale was caused by a breach of duty, not on the part of Hardin, but of Hare, and as there is no proof or pre *146 sumption of fraud on the part of the Hardins, it would be going far enough, under the circumstances of this case, to say that, upon mere principles of equity, Hare would have been entitled to be restored to his interest after the first sale, by paying up his proportion of the price due, McClure vs. Purcel &c. 3 Marsh. 64. Certainly, Hardin was under no obligation to him, to remain the proprietor of the land, or to make further payments on it, or to save it from further sale. The second purchaser was under no obligation to either of them. And the relations between them, growing out of their joint interest in the land, being at any rate terminated by the second sale to a stranger, Hardin was as much at liberty as any other person to purchase from him, the whole or any part of the land. And his purchase was, in our opinion, free from any equitable claim on the part of Hare, or his representatives, growing out of their previous relations. The Hardins expressly deny, and there is no proof, that the purchase by Mark, was made with any understanding between him and Martin D. that the latter was to have an interest, to which, as they allege, he was afterwards admitted, on agreeing to pay the whole state price for the land, and that he did so.
Held that the equity of Hare & his heirs is no incumbrance on the title of the Hardins.
In the view taken of this branch of the case, we have not noticed any question as to the right of redemption under the statutes directing the sale of land for non-payment of the price, because no attempt has been made to redeem. The equity of Hare is not placed on that ground; and, even in this case, no offer has been made, either by the original complainants, or by the heirs of Hare, in their cross bill, to reimburse any portion of the money paid by the Hardins, or either of them, for the land. It is farther to be remarked that, from the exhibits accompanying the answer of Mark Hardin, which, although not proved, are corroborated by several circumstances in the cause, it seems highly probable that, long before either of the sales by the register, Hare had bound himself to convey the whole of his interest—two thirds to Martin D. Hardin, and one third to James Kincaid. This, if it be so, certainly forms a sufficient answer to any claim by the heirs of Hare. But, without resorting *147 to this probability, we are of opinion, on the grounds before stated, that the Circuit Court did not err in considering the alleged equity of Hare’s representatives as constituting no subsisting incumbrance on the legal title of the Hardins.
A purchaser accepting for part of the land purchased (the vendor's title failing as to part,) is entitled to damages, or a reduction of the price, equal to the deficit compared with the price of the whole — unless they agree otherwise.
A party holding inchoate title to land, sells it—allowing the purchasers a certain period within which they may ratify or relinquish the bargain; surveys; inaccurate, and correct, having been made, the vendor obtains a patent upon the former, which includes only about half the land he sold: for the residue he can make no title. The purchasers elected to keep the land; but the proof does not show, that they then knew of the difference between the true survey, and patent: held, that their election to hold the land, does not preclude them of their right to a ratable deduction, on account of the deficit in the quantity secured to them.
Nor does the fact, that they took possession of, and held, that part of the land included in the survey and patent both—in the absence of proof that they entered intending to take possession of all within the patent boundary, amount to a waiver of their right to redress for their failure to obtain a part of what they contracted for.
The second ground on which the ability of the Hardins to convey according to contract, is denied, is that the patent covers but a part of the land included in Hare’s certificate and purchased by the complainants; and that for the part not included in the patent, the Hardins have no title. As to the matter of fact on which this objection rests, it is made entirely clear in the cause, that the patent, though including four hundred acres within its boundary, covers only about two hundred and twenty-six acres of the land included within the location, as stated in the certificate. And it is equally clear that, for the land outside of the patent, the Hardins have no title whatever, under the certificate. It is also obvious, from the recitals of the original contract, that its subject was the four hundred acres of land granted to Hare. And as the purchasers are willing to take a Conveyance of so much of the land described in the certificate, as the vendors can convey, they are, upon well settled principles, entitled to remuneration in damages, or a discount in the price, for the proportional value of so much of the same land as the vendors are unable to convey, unless by a change of contract, or otherwise, they have waived or lost this right.
The agreement of December, 1820, did not take effect as an absolute contract of sale and purchase, until it was made so by the election of the purchasers, in May, 1824. Before that time, the patent had issued to the Hardins, on the survey of April, 1814. It is contended *148 that, in making their election to take the land, the purchasers must be understood as referring to the land included in the patent, and as waiving their claim, if they had any, under the original contract to any land outside of the patent. The grounds for this argument are: first—that in the power of attorney constituting an agent to execute their notes and receive a conveyance, they speak of the land as granted to the Hardins; and, second—that, as the purchasers, from their residence and acquaintance in the vicinity of the land, must be presumed to have known the boundaries of the survey made on Hare’s certificate, and as they knew, before making their election, that a patent had issued, they must be understood as electing to take the patented land, not only from their express reference to the grant to the Hardins, in the power of attorney, but from the fact itself, of their electing to take a conveyance from the Hardins, who could, of course, convey no other land but that which was included in the patent boundary. But taking the power of attorney altogether, although it speaks of the land as the land granted to the Hardins, it furnishes no ground to presume that, the purchasers intended to refer to, or to authorize the acceptance of any other land than that which was the subject of the original contract; and certainly, their agent, in signifying their election to take a conveyance, designates no other; He was not authorized to make any change in the original contract; nor did he do so: but merely notified the Hardins that his principals elected to take a conveyance of the tract of land on the terms mentioned in their contract of December, 1820.
The other facts proved, do not authorize the presumption that the purchasers knew that the patent varied from the certificate, when they elected to take the land. There is no evidence that they had any information as to the description actually contained in the patent. If they must be presumed to have known the boundaries of the survey of April, 1814, which varied from the certificate, they must, for the same reasons be presumed to have known the boundaries of the second survey, made in May, 1814, in consequence of M. D. Hardin’s dissatis *149 faction with the first. And as the Hardins had a right to take out a patent for the land embraced by the certificate, and were in fact bound to do so after having sold and undertaken to convey that land—the purchasers had every reason to presume, that the patent actually issued, was founded, not upon the first survey, which covered little more than half the land embraced by the certificate, but upon the second survey, which was understood and intended to correspond exactly with the certificate, and which, in fact, corresponds very nearly with it. Moreover, it is stated in the answer of Mark Hardin, one of the patentees, that he did not know until 1826, that the patent was variant from the certificate. Bates, the agent of Martin D. Hardin, who superintended both the surveys, and who lived near the land, states, in his deposition, that he did not know until the year 1830, that the patent had been issued on the first survey. And there is no sufficient reason, as we think, to doubt the allegation of the complainants, that they were ignorant of the variance between the patent and the certificate, until after they elected to take the land. On the contrary, the facts authorize the inference that, when the purchasers elected to take the land, it was believed both by them and by the vendors, that the patent corresponded with the certificate.
It is further contended that, by taking and retaining possession of the four hundred acres included in the patent boundary, the purchasers have adopted that land, and have waived or lost their right to any remuneration or deduction for land not within the patent. But, although the possession taken within the boundary common to the certificate and the patent, might, if so intended, have given possession to the extent of the patent boundary, there is no proof that any such effect was intended, or that the purchasers ever designedly took possession of any land not embraced in the certificate, for the purpose of holding it under their contracts. The occasional cutting of wood upon the patented land not embraced in the certificate, (and for which compensation is allowed by the decree of the Circuit Court,) *150 does not affect the right of the parties under the contract.
The holders of an inchoate title sell the land, and are bound to make a good deed; but the survey upon which they afterwards obtain their patent, is so made, as to include a part only of the land embraced by their entry, and for the residue, land to which they have no title: having sold the land before the patent issued, the purchasers, claiming all the land within the entry, make a compromise of an adversary claim; within the entry, but not within the patent, by which they retain the possession of 35 acres of it: to that 35 acres the vendors could make no title; nor does it appear that the purchasers had acquired any, or that they could be secured in the possession of it, without bringing other parties before the court, who were not necessary, unless the vendors chose to make them so, in order to perfect the title they were bound to make: The compromise thus made by the purchasers, though made at the instance of their vendors, does not constitute a valid objection to a rescission of their contract of purchase, as to the 35 acres; they cannot be required to take the compromise, in lieu of the good title for which they bargained. But—
*150 We are of opinion, therefore, that the purchasers have done nothing by reason of which they can be adjudged to have elected; or ought to be compelled iii equity, to take the four hundred acres embraced in the patent, in lieu of the four hundred acres embraced in their contract.
It seems, however, that about the year 1830, by means of their contract with the Hardins, and under color Of their supposed title under that contract, they obtained possession of thirty-four acres and half of the land embraced in Hare’s certificate, but not covered by the patent; which possession they still retained at the hearing of the cause, and were then decreed to surrender to the Hardins. The thirty-four and a half acres thus obtained, is one half of the interference between the survey of Richard Nicholson, and that part of Hare’s certificate which is not included in the patent; The compromise by which it was obtained, was made by the purchasers with the assent of the vendors, with John Bates, already named as the agent who directed the surveys of Hare’s claim, and who appears to have been the equitable owner of an undivided interest of more than one half bf Nicholson’s claim, at the time when the surveys were made, as well as at the date of the compromise. A division line was agreed on and run, and the possession of the upper half of the interference surrendered to White &c. the residue being left in possession of Bates. The agreement, which was in writing, is not produced; and it does not appear whether there was any obligation on either part, as to a conveyance of title. Its sole consideration seems to have been, the supposition that there was a conflict between the titles of Hardin and Nicholson, and its only object to settle that conflict. The Hardins set up this compromise in their answers; and rely upon it as showing that to the extent of the thirty-four acres and a half obtained by it; their vendees have got the full benefit of the contract; and are, therefore, not entitled to a rescission as to that part of the land sold, nor to any allowance or deduction *151 on account of their not being able to convey it; and they intimate that they have an equity against Bates, for this land, which should have been covered by their patent, on the ground that it was owing to his improper conduct, as their agent in making the survey, that it was not actually covered by the patent. If they had established this equity, and had shown that Bates was possessed of, or could control, a valid title, and that he was bound by the compromise to convey it, there might be some reason for determining that the vendees should retain this portion of the land, and accept the title from Bates, in lieu of that which they had at first expected to get from the Hardins. These matters could not, however, be litigated with effect without having Bates and the heirs of Nicholson before the Court. And as the Hardins are themselves utterly unable to convey this portion of the land, and their vendees claim a rescission of the contract so far as they cannot convey, or show good title; if they intended to rely upon the fact that their vendees had been secured in this part of the land by means of their contract, but by another title than their own, and to compel them to take that title, it was their duty to show the fact relied on, and as a necessary means of doing so, and of perfecting the title, to bring before the Court the parties from whom the title was to come. The compromise was made by their advice and under their authority, and although actually entered into by their vendees, and not by themselves in person, the vendees are no more bound to trust to it, if it does not really secure them in the land, than if it had been made by the Hardins themselves; whose duty it was, if they meant to rely upon it as a bar to the relief sought by the complainants as to this part of the land, to take the proper steps for showing that it furnished an available security to the vendees, and might, therefore, without injustice to them, be substituted for the specific title which they purchased.
As they claimed and held the 35 acres by virtue of their purchase, and were thereby enabled to make the compromise, they should, upon the contract being thus far rescinded, be required to surrender the possession with such title as they have, to their vendors.
But this they have not done. They have not brought Bates and the heirs of Nicholson before the Court; they have filed no cross bill, even against the complainants, and they have not shown that their vendees are secured in the land by means of the compromise, The proof in *152 the cause repels the inference that they are thus secured.
First. The deposition of Bates proves that there was no intentional fraud in making the first survey variant from the certificate, and that it was intended for the benefit, and not for the injury, of the proprietors; and by the immediate reparation of the error, it was, so far as appears put in their power, to have the patent conformable to the certificate. Second. Bates swears that he did not know until after he made the compromise, that the patent had issued upon the first survey. And, as the fact of the compromise implies the idea of mutual and interfering claims, it may be assumed that this compromise was based upon the mistaken supposition, on the part of Bates at least, that the patent of the Hardins conformed to the second survey, and covered the sixty nine acres which was the subject of the compromise. Third. It does not appear that the compromise extended any farther than to fixing a division line, and surrendering the possession accordingly. Fourth. The title of Nicholson is not exhibited, nor any written evidence of Bates’ equity in it.
Under these circumstances, it being at least doubtful whether any title can be coerced from, or through Bates, it would be inequitable to compel the vendees to take this compromise, instead of a legal title to be conveyed by the Hardins. And as the Hardins, if they have any equity against Bates, which might form a consideration for the compromise, and give it validity, have not asserted it in any available form against Bates or Nicholson’s heirs—there can be no propriety in sending the case, back for a litigation, now to be commenced, between those parties. Bates and the heirs of Nicholson were not necessary parties to the contest between the Hardins and their vendees, unless the Hardins had made them so, or had shown such facts as rendered it the duty of the complainants to make them parties. This not having been done, there is no defect in the form of the suit, and it is ,to be decided on the record as it now stands.
The vendees not being bound to hold as apart of their purchase, the compromised land to which the vendors had no title, and which does not appear to have beep *153 secured by the compromise, the question is made, on the one side, whether they were properly decreed to surrender the possession of that land to the vendors, and on the other, whether they should not have been decreed to do some further act for transferring the benefit of the compromise. Upon these points we think little need be said. The possession, as already stated, was acquired by means of the contract of purchase and of the right to the land which the vendees were supposed to have derived from it. The compromise first proposed by one of the Hardins, and afterwards assented to, was made under the authority of the vendors, and for the benefit of both parties under the contract. The vendees have no right to separate it from the contract, or to set it up against or independently of the vendors. And as the former have chosen to rescind the contract under which they obtained the possession, and whatever other benefit was conferred by the compromise, equity seems to require that, with it, they should surrender, not only the possession, but all other right or advantage which they gained by it. It may be presumed that, if the Hardins had not sold to the complainants, they might and would have derived the same advantage from their claim, as their vendees have derived from it by the compromise. But be this as it may, the vendees have no right, upon rescinding the contract, to retain any interest in the land acquired by them solely in consideration of their right under the contract, and of their being in effect the representatives of the Hardins as to the land. The decree is, therefore, erroneous, to the prejudice of the Hardins, in not directing a transfer to them, of all interest which the complainants have under the compromise.
The ultimate question of right between the Hardins and Bates, is, of course, not decided; nor intended to be affected by this opinion; but must be left to be settled or litigated between them. It is intended only to decide between the present parties, and on the proof taken in this contest, that the vendees cannot be compelled to look to Bates for title, and that, as they rescind the contract, and obtain remuneration, or a credit, for the value of this portion of the land, they have no right also to re *154 tain the land itself, or any interest in it acquired in the manner above stated.
Land is sold, on which water fit for making salt is found. As to part of the tract (not including the salt wells,) the title fails, and the contract, as to that part, is rescinded: in ascertaining how much the agreed price is to be reduced, in consequence of the reduced size of the whole tract, the advantages of the salt wells in the vicinity, producing an increased demand for fuel and agricultural productions generally, and the probability, also, that salt water may be discovered on the land relinquished, are facts to be taken into the estimate; but the latter consideration is not entitled to the same effect as though the salt water was actually discovered.
There being then nothing in this case to rebut the equitable right of the complainants to rescind the contract so far as the Hardins are unable to convey—or their right to an allowance for the proportionable value of the land which, being included in the purchase, cannot be conveyed, it remains to inquire what is the proper criterion of that value.
Considering the land merely with a view to its adaptation to tillage, or to any other use of its surface, independently of the salt water procured or to be procured upon it, it is proved to be worth less than one dollar per acre; and the one hundred and seventy four acres which cannot be conveyed, is worth about as much per acre as the residue of the four hundred. But the contract was made with a view to the procurement of salt water; which was rendered probable by its having been procured upon the same fork of Goose Creek, both above and below Hare’s four hundred acres. And it was not until it had been actually procured upon this tract, and of a quality such as to justify the erection of a furnace for making salt, that the purchasers agreed to give two thousand five hundred dollars for the whole. What would have been given for the land before the experiment had been actually made, and salt water found upon it, cannot be told; but certainly, more than if no salt water had been previously obtained on the creek which runs through it. It must be considered equally certain that the procurement of salt water on this tract, increased the value of the whole tract, not only by the actual value of the salt water itself, but also by the additional uses which the making of salt upon the land would create for the wood and other products of the soil, and by the increased probability that salt water might be procured at other places within the tract, on the same . creek. And we are bound to conclude that all of these elements of value were taken into view in fixing the price of twenty five hundred dollars upon the whole tract. The difference between $2500, the agreed value of the whole 400 acres, and $300, which might have been its *155 value if no salt water had been found upon it, or in its vicinity, cannot be considered as entirely concentrated in the salt well, nor in one acre of land around it, nor in the 226 acres of patented land within which the well is situated. A great part of it is doubtless to be considered as the value affixed to the well itself, but a great portion must also be regarded as applicable to other parts of the land, in proportion, to the benefit derived from the vicinity of the salt well and works, and to the probability of obtaining salt water on any part. It is, perhaps, impossible to ascertain the exact degree in which these elements of value exist in different parts of the land; but it would be impossible to ascertain correctly the ratable value of any part in proportion to the agreed value of the whole, without regarding all of them.
Comp’ts succeed in obtaining a specific execution, as to part, and a rescission as to the residue of their contract for land: the costs of ascertaining the relative values of the respective portions, was properly taxed against the defendants with the other costs of the suit.
*155 We are of opinion, therefore, that the Circuit Court did not err in looking to- the probability of obtaining salt water on the 174 acres which cannot be conveyed, as one of the circumstances by which its value between these parties, is to be estimated. And as that probability, however strong, cannot be as valuable as the salt water actually obtained, and cannot give as much value to the adjacent land, we are also of opinion that the Court properly rejected the estimate of the commissioner, and of those witnesses, who, on the ground of their belief' that salt water might certainly be obtained within the boundary of the 174 acres, as good or better than that which had been obtained on the land common to the patent and the certificate, estimated the value of the former as bearing the same proportion to the total value of two thousand five hundred dollars, that 174 bears to 400. Other witnesses, looking to the same criteria of value, were of opinion that, estimating the whole tract of 400 acres to be worth $2500, the part of it not included in the patent is worth about $500. This sum was adopted by the Court, as the true proportionate value. We are inclined to think it not unreasonably high; and it was certainly not too low. In other respects, the account between the parties, arising on the partial rescission of the contract, seems to have been properly adjusted. And as the complainants were entitled to succeed, and did suc *156 ceed, in obtaining a decree for the partial execution, and partial rescission, of the contract, we think the costs of estimating the value of the land, which was an incident to the partial rescission, were properly decreed, with the other costs of the suit, to the complainants.
Appeal and w. e. on the same decree : a partial reversal in favor of the pl’tfs in error: affirmance in all other respects; the appellees recover costs upon the appeal; the costs of the w. e. are divided.
On the whole case, we perceive no error which can avail the complainants, on their appeal; and none to the prejudice of the Hardins, except in the failure to decree the transfer, or relinquishment, to them, of all right and interest acquired by the compromise. The decree, therefore, is affirmed in all other respects, and, as to this point, is reversed on the writ of error of the Hardins, and the cause is remanded, with directions so to amend the decree as to direct the complainants to transfer to the Hardins, without recourse, all their right and interest in the thirty four and a half acres of land above mentioned, derived or held by them, under the articles of compromise with Bates, above referred to. The Hardins are entitled to be paid their costs on the appeal, and, the decree being partially affirmed, and partially reversed, on the writ of error in which they are plaintiffs, the costs on the writ of error must be divided.