Martin and Yates *vs.* Tidwell and Favor.

Wright Martin and Joseph G. Yates, administrator of Jackson Martin, plaintiffs in error, *vs.* M. M. Tidwell, John Favor, *et al.*, defendants in error.

Note.—Warner, C. J., did not preside in this case.

1. There being evidence to sustain the verdict in this case, and the Judge who tried it being satisfied with it, a new trial is refused.

2. A partnership may exist where there is a joint interest in property and in the profits and losses of the adventure.

3. While the conduct of the juryman, Jones, was unbecoming, yet, as it was known to the counsel complaining before the verdict was rendered, it is no good cause for a new trial.

4. Where a Court of Equity obtains jurisdiction for one purpose, it will retain it until complete justice is done to all the parties.

5. In a creditors' bill others not parties may come in after decree, submit to the jurisdiction of the Court, and have their rights passed upon, and participate in a fund to which they may be entitled, according to the principles of equity.

In Equity in Fayette Superior Court. Motion for new trial. Decided by Judge Warner, March Term, 1867.

The bill charged that in the latter part of 1858, Jackson Martin and Wright Martin purchased of Martin Waldroup a tract of land in said county, with the crop thereon, and the stock of cattle, &c., to farm as partners; that they borrowed from John Favor money to assist in said purchase, and gave their joint note therefor; that they made and delivered to said Waldroup their joint and several note for $1,137.50, which was in part payment for said land.

The notes are exhibited by copies in said bill.

It further charges that in a due course of trade, and for a valuable consideration, M. M. Tidwell purchased said Waldroup note; that said Wright and Jackson stocked said farm with their respective slaves, and carried on the farmed as partners for several years; that Jackson Martin died, leaving the joint property on the farm, including six bales of cotton; that Wright Martin has sold said cotton and holds the proceeds of it; that Joseph Yates is the administrator of said Jackson Martin's estate, and as such he has sold some of the stock and other property of said estate, and some of the

joint property of said firm; that the land (worth not more than $1,000.00 or $1,500.00) and the proceeds of said cotton is the only means to pay the debts, because the estate and Wright Martin are otherwise wholly insolvent; that Wright Martin will not pay said debts; and that he will, unless restrained, dispose of proceeds of said cotton to his own use; that he has no family exept his wife; that they have heard that he says he will never pay any of said debts; and that the complainants fear he will leave the State.

The prayer is for subpœna, for injunction restraining said administrator from disposing of any more of the firm property or money, except in payment of said debts; that Wright Martin pay said money to a receiver of the Court; and that he and said administrator pay into Court all assets of the firm for the benefit of its creditors, (and for *ne exeat* against said Wright Martin, and general relief.)

M. M. Tidwell having sworn that he could not obtain the sanction of the Judge in time to remedy the mischief feared, the Clerk of said Court issued process directing the Sheriff to arrest Wright Martin, and keep him in close custody till he delivered to the Sheriff said proceeds of the cotton, or gave bond to complainants for $2,000.00 for the forthcoming of said money to answer the decree of the Court; and that Wright Martin give bond for $4,000.00 not to depart the State until further order of the Court.

On the 30th January, 1866, the Sheriff arrested Wright Martin, and took bonds in terms of said process.

Complainants, by leave had, amended said bill. Thereby they charged that said land contained two hundred and fifty acres; that said Wright and said Jackson farmed as partners thereon till said Jackson's death; that they had about an equal number of hands, and were each to have one-half the proceeds of the farm; that said administrator has the deed to said land, which has never been recorded; that he has had half of the land appraised as belonging to said estate, and that he intends to sell said half as such; that said Wright Martin acquiesces therein, and thus exposes the land to be taken for individual debts to the exclusion of joint debts; that Wright

Martin sold said cotton to James M. Austin, who did not pay in full for the same, but owes therefor about one thousand dollars, for which he has given to said Wright Martin a note, since the service of said bill; that their said debts constitute three-fourths of the firm debts; that they have offered Wright Martin indemnifying bonds if he would, as surviving partner, pay the whole or any part of said debts; and that he refused and threatens not to pay any part of them.

The prayer is for discovery from Austin of all the facts concerning the purchase of said cotton and payment for the same (waiving answer by Wright Martin), and for injunction against his (Austin's) paying said note; that a receiver be appointed to sell said land, and to take charge of the proceeds of said cotton and stock, to satisfy the complainants and other firm creditors who may become parties to said bill; and that Wright Martin and said administrator be enjoined from making any disposition of said assets.

It further prayed that the Sheriff, or other suitable person, be appointed receiver, and that he arrest Wright Martin and keep him in custody until he deliver to said receiver all money, debts, or evidences of debt, of said firm, and especially the proceeds of said cotton.

Judge BIGHAM, at Chambers, sanctioned said bill as amended, confirmed what had been done, appointed William W. Matthews, Sheriff, receiver, and ordered injunction and arrest as prayed for.

After the arrest, complainants again amended their bill, by charging that Wright Martin had Austin's note for only $1,000.00; that he sold the cotton for $1,240.00, and had applied part of it in paying an individual debt of Jackson Martin to said Austin.

James McElroy and William Thompson were creditors of said firm, and upon request, were made parties complainant in said bill.

Wright Martin alone answered said bill.

The answer admits the purchase; says that the price of the land and stock, &c., was $2,275.00, but denies that it was made with a view of farming with Jackson Martin as part-

ner.; it states that after said purchase he did send his negroes to said farm, but it was only because he had no home for them, and because he expected Jackson Martin to pay him their hire.    In 1863, he called on Jackson Martin for a settlement, and agreed to let said Jackson have the whole of the stock and crop bought with the land, receiving therefor one-half of six bales of cotton then on hand, and half of three or four hundred pounds of lint cotton ; and it was then, or about that time, agreed that the land should be divided and each take his share of it.    He and his brother Jackson went into the army ; Jackson never returned, and the land was not divided.    After Jackson's death and administration on his estate, the administrator had half of the land appraised, which Wright Martin did not object to, as he supposed it was proper to sell it and pay Jackson's debts.    He and his brother borrowed from Favor $811.80, for which the note exhibited was given, and they gave Waldroup a note for $1,137.50 ; the money borrowed from Favor was to pay in part for the land, and the note to Waldroup was for the balance of the purchase money.    He sold the six bales of cotton for $1,230.00 or $1,240.00 to James Austin on a credit till the first of May, 1866 ; after deducting some claims which Austin held against Jackson Martin, he (Austin) gave Wright Martin his note for $1,000.00, due as aforesaid, which note he had placed in the hands of one of his securities on his bond, and to secure counsel fees.    He received in cash for the cotton only $49.00, and is responsible for half of the proceeds of the cotton to Jackson's estate.

He admits that Yates, as administrator, sold some personal property of Jackson Martin's, but denies that he (Yates) sold any property belonging to him and Jackson as partners, or any joint property, except a corn-sheller, which was bought with the land, and the administrator paid him his half of what it brought.

The land is worth as much as charged; it and the proceeds of the six bales of cotton is all of the joint property. He admits the insolvency as charged, and that he has no family except his wife; but denies any intention to leave the

State, and all collusion or fraud; says he has not paid complainants, because there are other creditors, and has not said that they shall never have their money; but said that they cannot collect the same by their bill, because he and Jackson were not partners, and did not farm together as such.

By an amendment to the answer, Wright Martin says that Jackson Martin alone carried on said farm, and had his (Wright's) negroes only part of the time, paying hire for them as aforesaid; that the labor of his slaves was nothing like equal to that of Jackson's slaves, and denies that he was to receive one-half of the proceeds of the farm, or that he was in any sense a partner in the same. He says that Jackson Martin impliedly owed him for hire of slaves and rent for his half of the land and one-half of the stock purchased. He says that the land is still jointly owned by him and said estate; that Austin's note for $1,000.00 was given for the cotton, and is still unpaid; and that he paid out $49.00 as a part of the expenses on said cotton. He denies having any assets or evidence of debt belonging to said estate in his possession or control.

By a second amendment to his answer, he says he paid $25.00 to Williamson Jenkins for hauling three bales of said cotton to Atlanta, Georgia, five dollars to Nathaniel Grizzard for assisting in hauling them; that he owes $20.00 to Mary Martin, and to James Austin $10.00 for repacking one bale, and whatever is right for patching and roping said cotton; that Austin agreed to take the cotton at forty cents per pound if he were allowed to retain $177.80 to apply to a note Austin held against Jackson Martin, which he (Wright) agreed to, and though he has never seen the note, and knows nothing of it, he believes it was so honestly applied.

The complainants' evidence was as follows:

JAMES McELROY swore that he lived near the farm of Jackson Martin; Wright Martin's hands worked there with Jackson's; witness ginned the cotton, six bales, of which one-twentieth was witness' for the toll; Wright sometimes stayed at Jackson's and sometimes at Hobgood's; Wright

Martin and Yates *vs.* Tidwell and Favor.

and Jackson both claimed the land; Jackson claimed all the stock except one mule, which was Wright's.

MR. —— THOMPSON testified that in fall of 1861, Jackson employed him to oversee Jackson's and Wright's farm. At Fairburn, Jackson asked him what he would work for; witness informed him; he said he would see Wright about it; shortly afterwards, Wright asked witness if he had seen Jackson and traded with him; witness said "Yes," and Wright said "All right; I will be satisfied with any arrangement Jackson makes; do the best you can." Witness went there in fall of 1861, and lived there in 1862; left six bales of cotton on the place. Wright had the strongest force; the hands all worked together. Witness was to receive $225.00 for 1862, and at that rate for the time in 1861; $164.00 still due to witness; the bales of cotton were good, weighing from 450 to 500 pounds; Wright Martin sold it in January, 1866; Wright told witness at Hobgood's that he, Wright, had a right to wind up the business; that he had an interest in it; that he had a right to sell the cotton and pay witness and the other creditors of the concern; that Yates ought to let him wind up the business. Wright had two negro women and two girls and one boy (a pretty good plough boy); the negro woman had four or five children; Jackson had a man and two women; the mules belonged to Jackson. When witness went to the farm, he found provisions there, and when he left, he left provisions there. Witness talked with Wright about being hired as overseer in October, 1861.

The note read in evidence as follows:

"$811.80. By the twenty-fifth December, eighteen hundred and fifty-nine, we promise to pay John Favor or bearer eight hundred and eleven 80-100 dollars, and if not punctually paid, interest from date, for value received. September 16th, 1858. · JACKSON MARTIN,

"WRIGHT MARTIN.

"C. CLEMENTS, Security.

"Credit—March 2d, 1861, three hundred and seventy-five dollars."

22

Mr. GODWIN testified that he saw Wright's and Jackson's hands working together on the Waldroup place in 1861-2-3; heard Jackson say he had six bales of cotton; Wright wished to sell some of it, but Jackson refused to allow it; said he was going to let Favor have it to pay his debt; has heard Wright say he had half interest in the cotton; never heard anything about a partnership.

Jackson said Wright wished something for the labor of his hands; in 1864, Jackson and Wright wished witness to decide how much said work was worth, but they being witness' neighbors, he would not decide. Wright's negroes had several children. Jackson had control of the farm, and owned all the mules, except one young one; Wright bought nothing for the farm. In 1864, Jackson called on witness; Jackson was lingering three or four months; Wright took the negroes away in September or October, 1863.

JOHN FAVOR swore that in 1858 he loaned money to Wright and Jackson to buy land; Jackson told witness during the war he might have the cotton to pay his (witness') debt; that he had heard both Wright and Jackson acknowledge the partnership; Wright said he wished witness to have the money, but was advised to hold it until it was settled by law; Tidwell and witness demanded the money from Wright; he said he would come and see us, but did not come; Wright said he was advised to sell the cotton; Wright and Jackson both present when the note was credited; both said the note was given for money to pay for the land; Wright said Colonel Huie and Blalock had advised him there was a partnership; they farmed together, and jointly owned the land; Wright did not use the word partnership, but said "we"; witness thinks Wright also said Tidwell advised him likewise that there was a partnership.

Complainant read in evidence the deed from Martin Waldroup, executed in Fayette County, Georgia, 1st September, 1858, conveying to Wright and Jackson, their heirs and assigns, in consideration of $1,800.00, lot number fifty-nine, and northeast corner of lot number forty, in the ninth

district of said county, being two hundred and fifty acres, more or less.

JOHN HUIE testified that Wright represented to him that the farm was in copartnership; that they had bought corn, &c., for the farm; that the cotton was raised on the farm, and wished to know of witness whether he could not sell the cotton, as surviving copartner. Jackson's estate and Wright's are both insolvent. Afterwards Wright seemed to have changed his mind; he came to witness and said there was no partnership. Judgment on Favor's note is against Jackson and Wright jointly; Austin's note was drawn from Blalock's possession by process of the Court.

MR. —— THOMPSON, reintroduced, testified that Wright paid him $40.00 for overseer's wages, and said he and Jackson were both bound for the balance; Jackson employed witness; witness considers both bound to him, and Wright promised he would pay witness when he (Wright) sold the cotton.

Q. C. GRICE testified that he wrote the deed and saw it executed at the date therein specified, and wrote the note which Tidwell now holds and saw it signed; it was given for the land; did not recollect what was said when the deed and note were signed.

M. M. TIDWELL testified that Wright Martin said he had six bales of cotton, and asked whether he could sell it, as surviving partner, and witness told him he could; witness bought the note from Waldroup at ten per cent. discount; Wright said he wished to sell the cotton and pay the debts, and afterwards said he had sold it, and had the money, but would not pay it out except under the law; he showed witness a roll of money.

Z. B. BLALOCK testified that he went with Jackson to see Waldroup, to buy the land; Jackson was living in a rented house, and the land was bought for a home for Jackson; Wright asked witness if he could sell the cotton as surviving partner, and witness told him he could.

Complainant then read in evidence the following note:

"$1,137.50.    By the twenty-fifth day of December, eighteen hundred and fifty-nine, we or either of us promise to pay Martin Waldroup or bearer eleven hundred and thirty-seven dollars and fifty cents for value received.

                                "JACKSON MARTIN.
                                "WRIGHT MARTIN.

"*Sept. 21st*, 1858."

Complainant closed.

Defendants introduced the following testimony :

Dr. STEPHEN MALONE testified that he practiced for Jackson Martin, and always charged the account separately ; that Jackson said he had hired Wright's negroes to work on the farm, and was constantly quarreling about Wright's women and children being so expensive ; that Wright had two women, two girls, and a plough-boy ; that both owed witness ; that witness went to Jackson to buy corn and wheat off the farm—he refused, saying it all belonged to him, that it was enough for him to pay his debts, and he would not pay Wright's debts out of the corn and wheat ; their negroes worked together on the farm ; Wright was single, had no home, sometimes stayed at Fairburn and sometimes at Hobgood's ; owned more negroes than Jackson.

WRIGHT MARTIN testified that, in 1858, Jackson asked him to assist him to buy a home ; he said he did not like to sign notes, and Jackson said unless he did assist him, he (Jackson) would have to sell his negroes ; as the negroes came from their father's estate, witness did not wish them sold, and he and Jackson bought the land together, to be divided when witness desired it done ; Jackson moved on the farm ; witness' negroes were hired out the first year or two ; witness went to the war, and sent his negroes to Jackson's home ; Jackson said he would pay witness what was right for their work ; in 1862, witness wanted pay for said hire, and Jackson said witness could have half of six bales of cotton therefor ; witness said it was not enough ; they proposed to leave it to Godwin—he refused to decide, and witness then agreed to take said offer.    In the summer of 1863 witness took his

negroes away; he never got a bushel of corn or other produce raised on the farm; after Jackson's death, his administrator, Yates, said half the cotton was witness', and he wished to sell it; witness said, let's sell it and pay the security debts. Witness and Yates then agreed to leave the question to Blalock, Huie and Tidwell whether the cotton was copartnership property or not. Tidwell told witness to sell the cotton, that it was copartnership property; witness told Tidwell he (witness) did not know what it took to constitute a copartnership. Tidwell came to witness and said he wanted his money; witness promised to see him in Fayetteville—promised twice but saw him only once; he told witness to pay him four or five hundred dollars, and say nothing about it, and took witness into a grocery and treated him. Witness paid Thompson forty dollars for Jackson; witness never told Thompson he was bound for his overseer's wages; witness got half the cotton for hire of his negroes; witness told Tidwell and Favor that he would see them in Fayetteville on Wednesday, promised twice but saw them only once; came to Blalock's and to town, but did not go to see Tidwell. Tidwell and Favor did promise a refunding bond if witness would pay them; witness did not recollect whether he met Blalock the first or second time when he promised to see him; did not recollect seeing Favor when witness saw Tidwell in town. Huie said if witness paid Tidwell he would do wrong; that witness had better watch Tidwell; that half of the cotton money ought to go to the administrator. Witness hauled off the cotton in day-time and sold it, acted under Tidwell's advice; witness told Tidwell that Blalock and Huie said it was not a partnership, Tidwell said it was. Witness regarded Huie as his counsel, and asked him if he could sell the cotton. Huie said he would do all he could for witness. Blalock and Huie told witness it was a copartnership before the cotton was sold. Witness did ask Brack Blalock what was a partnership, and he said it was a hard question. Witness sold the cotton January 20th, 1866, to J. M. Austin, for $1,226.00. Austin paid Witness $49.00 to pay expenses, and was to cancel note on Jackson Martin and give witness note due 1st May, 1866,

for $1,000.00. Witness did not consult an attorney in Atlanta, though he spoke to Colonel Calhoun about a case in Fayetteville. Austin said execution might be levied on the cotton; witness said it could not, under the stay-law; witness did not tell Austin he was selling as surviving copartner, but sold the cotton as witness usually sells cotton. There was no copartnership; we bought the land jointly, were to divide it; witness went to the war, and it was not divided. Witness had no interest in the crop: Tidwell wanted money before the cotton was sold.

J. L. Blalock swore that he told Wright Martin to sell the cotton and pay one-half to the administrator.

The defendant closed.

Complainants read in evidence the following note:

" $1,000.00. By the first day of May next, I promise to pay Wright Martin or bearer one thousand dollars, for value received. This 20th January, 1866.

" J. M. AUSTIN."

John Huie, re-introduced, testified that he was in Blalock's back-room when Tidwell and Wright Martin conversed about the cotton; Tidwell proposed what was fair. We then walked out; Tidwell and Wright stopped at the horse-rack; witness did not hear all they said; heard all till Wright mounted his mule. Wright talked with witness thrice times about this cotton, first time merely asked witness' opinion; he proposed to employ witness, and witness said he was willing to represent him against the administrator but not against the creditors, as witness held Favor's claim for collection; witness forgot to tell him that he had Favor's claim in first conversation.

M. M. Tidwell, re-introduced, testified that he told Wright Martin to pay him and all the other creditors some money, and they would let him keep some as a nest-egg.

Here the evidence closed.

The Court charged the jury (after charging as to the law of partnership, which was not excepted to), that a partnership might exist when there was a joint interest in property and a

joint interest in the profits and losses of any adventure or enterprise; as when one partner is not known, yet if he is jointly interested in the profits and losses of the particular business in which the parties are engaged, the law will regard him as a partner in that particular transaction.

To this charge defendant's solicitors excepted.

The verdict of the jury was,'" that James M. Austin do pay into the Clerk's office of this Court one thousand dollars, with interest from the 1st day of May, 1866, by the first day of April next; and after application of that amount to complainants, *pro rata*, that, on the first Tuesday in November next, after thirty days notice being given, the Receiver or Sheriff will sell the copartnership premises, containing 250 acres of lot No. 59, and fifty acres of lot No. 40, as contained in said deed, and that said Receiver or Sheriff pay the proceeds to complainants, *pro rata*, and that defendants pay the costs."

During the term a new trial was moved for, on the grounds:

1st. That the verdict was contrary to the evidence and decidedly against the weight of evidence.

2d. That the Court erred in charging as aforesaid.

3d. Because one of the jurors who tried the case, (C. S. Jones,) while the case was being tried and before it was submitted to the jury, said, in presence of two of his fellow jurors, and in hearing of counsel engaged in said case, that there was no use for the lawyers in the case to make speeches to him, for his mind was made up, and they could not change it by anything they could say.

In support of this last ground, plaintiff in error read two affidavits as follows:

Affidavit of R. C. BRIDGES, who swore that, during said trial, and before the case had been submitted to the jury, at a recess of the Court, said C. S. Jones remarked in the presence of him and others, that his mind was made up, and it would not do any good for the lawyers to speak to him, as they could not change him by anything they could say:

Affidavit of JOHN D. STEWART, (one of defendant's solicitors,) who swore that, during said trial, after the evidence

was closed, but before any argument or the charge of the Court, during the recess for dinner, and while deponent and and J. Q. A. Alford were walking towards the hotel, three of the jurors trying said cause, to-wit, R. C. Bridges, Burket Rentfro and Charles S. Jones, were walking before them, and said Jones remarked to the others that there was no use for the attorneys to make speeches in said case, as his mind was made up, and nothing they could say could change him. He could have been heard five or eight yards.

Solicitors for defendant in error produced the affidavit of said JONES, who swore that he remarked to Bridges and others of the jurors (at time specified in the other affidavits), that he did not think it worth while for the lawyers to speak on the case, and further, he swore that he had not then made up his mind, and that he did not say to Bridges that he had made up his mind, and that it was unnecessary for the lawyers to speak, and that he thinks all the testimony had been given in when he spoke as aforesaid.

The Court refused a new trial. Defendant's counsel excepted, and assign as error the grounds aforesaid.

J. L. BLALOCK, J. D. STEWART, and J. Q. A. ALFORD, for plaintiff in error.

TIDWELL & FEARS, and JOHN HUIE, (represented by N. J. HAMMOND,) for defendant in error.

WALKER, J.

1. The evidence in this case was conflicting; perhaps it preponderated against the verdict; but, as there was a considerable amount of evidence in favor of it, and the Judge who presided on the trial was satisfied, we will not disturb it.

2. The second error alleged, is that the Court charged the jury "that a partnership might exist where there was a joint interest in property, and a joint interest in profits and losses of any adventure or enterprise." If there be error in this charge, it was not such an error as defendants below can complain of. The Code, §1892, says, "A joint interest in

the partnership property, *or* a joint interest in the profits and losses of the business, constitute a partnership as to third persons." The rule laid down by the Court required more proof to constitute a partnership than the statute does—he required both a joint interest in the property and in the profits and losses.

3. While the conduct of the juryman (Jones) was unbecoming for a man acting under the solemnities of an oath, still, we cannot for this cause set aside the verdict. It is the duty of the jury to hear all the evidence, and all the reasons urged by counsel in favor of their respective sides of the case, as well as the law given in charge by the Court, and when the case is thus submitted to their determination, *then* proceed to make up their verdict *and not before.* The verdict should speak the truth of the case, and until the jury hear the whole case their minds should be entirely free, so that upon an impartial consideration of all the facts and the law applicable thereto, they may do equal and impartial justice.

We might not have granted a new trial in this case, if the the juryman's misconduct had been unknown to the counsel, until after the rendition of the verdict; but certainly we ought not to do so when the counsel, knowing the facts, chose to take his chances before the jury notwithstanding. If, with a full knowledge of the facts, he permitted the trial to proceed, he must submit to the consequences. Doubtless if the matter had been brought to the knowledge of the Court at once, he would have taken such action as would have been proper under the circumstances.

4. When a Court of Equity obtains jurisdiction for one purpose, it will retain it, until full and satisfactory justice is rendered to all the parties concerned. Walker vs. Morris, 14 Ga. Rep., 323. We think, therefore, the Court very properly so moulded its decree as to do complete justice and settle the entire partnership business.

5. We intimate no opinion as to what may be the rights of others, not before the Court, in portions or all of this property. This being a creditor's bill, others may be heard here-

after, in the assertion of their rights, if such rights exist. M. & W. R. R. Co. vs. Parker, 9 Ga. Rep., 394–6 ; McDougald vs. Dougherty, 11 Ga. Rep., 588.

Judgment affirmed.