## Rice A. Beal v. Alvan W. Chase and others.

*Equity pleading and practice: Appeals: Second decree.* Under our statute (*Comp. L. 1871, § 5181*) providing that on a chancery appeal all proceedings shall be stayed until otherwise ordered by the supreme court, a second decree, granted while an appeal from a prior one was pending, and made as an additional decree upon no new hearing or proofs, is held unwarranted, and is reversed.

*Appeals: Second decree: Costs.* Such second decree, however, having been made on the judge's own motion, and the return not having been duplicated, its reversal is without costs.

## BEAL v. CHASE.

*Restraint of trade: Extent of restriction: State limits.* A provision in a contract for the sale, upon a full and adequate consideration, of a printing and publishing establishment and business and good-will, together with a newspaper and the copyrights of certain books, that the vendor should not engage in the business in the state so long as the vendee should continue in the business at the place of sale, is held not an unreasonable restraint of trade, where the business so sold extended over substantially the whole territory of the state, and is sustained against objections that it was void as being against public policy.

*Contract in restraint of trade: Corporations: Injunction.* The restriction imposed by such a contract was enforced by injunction in this case against a corporation of which the vendor afterwards became principal stockholder and president and business manager, and which was organized to conduct a business in direct violation of his contract, with full notice thereof, restraining it from carrying on such business with or for such vendor, directly or indirectly.

*Corporation: Stockholder: Injunction.* Whether a corporation can be restrained from dealings prohibited to a stockholder, merely because it has such stockholder:—*Quære ?*

*Contract: Right to receive business letters: Injunction: Specific performance.* Under a provision in such a contract, that the vendee was to have the privilege of receiving the letters connected with said business, and of opening the same, it was held that the vendee was entitled to all correspondence intended for the establishment and business he had purchased, and that in case of doubt he was entitled to the benefit of the doubt; and a decree enforcing this stipulation by injunction against the vendor, and directing a power or authority to be executed to carry out its terms, is affirmed.

*Publications: Contract not to engage in business: Restriction: New publications.* One who had sold for an ample price his establishment and business, conducted under the name of "Dr. Chase's Steam Printing House," and the copyright of a very popular receipt book entitled "Dr. Chase's Recipes," etc., with the good will of the business and the right to use his name, and had covenanted not to engage in the business within the state while his vendee continues it, is held precluded thereby from any right to publish in the state any receipt book so connected with his name as to lead to the inference that it was designed to supersede the old one; and the new receipt book published by defendants in this case, with its title and announcements, is held to have such a tendency.

*Contracts in restraint of trade: Specific performance: Damages.* The question of damages for the breach of the contract of restriction in this case is left to be determined at law.

*Heard October 16, 21 and 22, and January 19 and 20. Decided April 27.*

Appeal in Chancery from Washtenaw Circuit.

*E. D. Kinne* and *A. Felch*, for complainant.

*Lawrence & Sawyer, H. J. Beakes* and *G. V. N. Lothrop*, for defendants.

CAMPBELL, J.

In this case there have been two appeals taken. The

last one was from a decree taken while the former was pending in this court, and was made as an additional de-cree upon no new hearing, and upon the case as presented to the circuit court when the first decree was made. As the statute expressly declares that on a chancery appeal " all proceedings shall be stayed until otherwise ordered by the supreme court" (*Comp. L., 1871*, § *5181*), a majority of us think the circuit court had no power to make the second decree, and that it should be reversed, but without costs, as the return was not duplicated, and the second decree was made on the judge's own motion. We do not discuss the questions covered by it.

Upon the first decree the court have arrived at a substantial agreement, although not agreeing in all respects in the reasons on which their action will be based. They will content themselves with as brief a reference as will make their views intelligible.

The bill was filed to restrain the alleged violation of rights secured to complainant in connection with a sale to him by defendant Chase of a printing and publishing business and certain copyrights. Chase had built up a large and prosperous business in Ann Arbor, known very generally through the state and elsewhere, and having a widely extended custom, under the name of "Dr. Chase's Steam Printing House." He had also published a very popular receipt book, which was circulated largely by means of correspondence and agencies, as well as advertising, and brought in large profits. For a large and adequate consideration Chase sold to Beal his whole establishment, including a newspaper, the receipt book and other copyrights, "together with the good-will of the business of printing and publishing, and also the right to use the name of Dr. Chase in connection with said books," and providing that the said Beal, on his part, if he chooses, may carry on said business, and shall have that exclusive right, under the name of "Dr. Chase's Steam Printing House," and may add "R. A. Beal, proprietor." The accounts were also transferred, and some

other things not important here. The following important provisions are directly involved in this controversy. Chase agreed not to engage directly or indirectly " in the business of printing and publishing in the state of Michigan" so long as Beal should remain in the business of printing and publishing in Ann Arbor. Beal was also "to have the privilege of receiving the letters connected with said business, and opening the same."

This was in August, 1869. Chase left Ann Arbor not many months thereafter, and was absent some time in another residence in the west. Just after the sale he gave Beal authority to take from the postoffice all letters not directed to his private box, and to obtain and receipt for all remittances and orders for money. Beal continued in a prosperous business and unmolested until the course of action complained of began in 1872.

Chase during that year having conceived the opinion that his contract was void, as an undue restraint of trade, began preparations for a new printing business, and began to prepare a new receipt book, and revoked his authority to Beal to obtain the letters not addressed to the printing house.

In August, 1872, several persons, who had been thinking of setting up a printing establishment, but who had done nothing, negotiated with Chase, the result of which was the formation of the defendant corporation, with a nominal capital of fifty thousand dollars, of which Chase took one-half. They immediately began a general printing and publishing business, and started a newspaper, and became formidable rivals of Beal. Dr. Chase became and was announced conspicuously as their president and business manager. He prepared a new receipt book, which was called Dr. Chase's second receipt book, and which purported to include receipts on many subjects, covering similar ground with the first, but more extensive and higher priced. Vigorous efforts were made to circulate it as superior to the first,

and it was brought directly to the attention of persons who had dealt in or purchased the first. For this purpose use was made of correspondence intended for the publishers of the first book, and persons writing for that were informed of the publication and impressed with the superiority of the second book.

Beal filed a bill in 1872 to restrain the publication of this second receipt book, which the Ann Arbor Printing and Publishing Company had made an agreement to publish on a royalty. In July, 1873, the present bill was filed, complaining of all the acts above mentioned.

After suit brought, Chase sold out his stock and retired from the company, and the publication of the second receipt book was removed to Toledo.

The final decree enjoined Chase from being engaged directly or indirectly in the printing and publishing business in this state, or printing or publishing the second receipt book in this state, and from taking or opening any letters relating to Dr. Chase's recipes, or Dr. Chase's steam printing house. The defendant corporation was enjoined from doing said business with or for Chase, directly or indirectly.

We are all agreed that Chase's connection with the business of the defendant company was such as to be a direct violation of his contract, and that the company knew of the contract throughout. We are all agreed that the measures taken to get a circulation of the new receipt book, by the agencies and correspondence which had been or were at any time used or designed for the first, were unlawful. We are all agreed that Beal was entitled to all correspondence intended for the old establishment and first receipt book, and that in case of doubt he was entitled to the benefit of the doubt as to its being so intended.

We are all agreed that Chase had no right to publish, by the terms of that contract, in Michigan, if valid, any receipt book so connected with his name as to lead to the inference that it was designed to supersede the old one.

BEAL v. CHASE.

And we concur (with some doubt on the part of one of us) that the new receipt book, with its title and announcements, has that tendency.

Concerning the validity of the agreement, we concur in regarding it as not unreasonable in fact, and as based on full consideration. One of us has doubted whether it could properly include the whole state; but considering the rule to the contrary as somewhat artificial, he concurs in maintaining the agreement.

Although some questions might arise as to whether a corporation could be restrained from dealings prohibited to a stockholder, merely because it had such a stockholder, we do not discuss that, because Chase's connection with this company was something more, and the terms of the decree cannot fairly be wrested into any unreasonable meaning.

Our conclusion is, that the first decree should be affirmed, with costs, leaving questions of damages to be determined at law, and directing a power or authority to be executed, whereby Beal can obtain the letters belonging to him, and making such modifications as are necessary to that end, and, until such authority is executed, that the decree stand as equivalent thereto, and may be used to obtain such letters from the postoffice.

GRAVES, CH. J., and COOLEY, J., concurred.

The following opinion was prepared by Judge Christiancy prior to his resignation, and on his retirement was left with the court to be filed in said cause on its final determination.

CHRISTIANCY, J.

The bill in this case was filed July 14th, 1873, in the Washtenaw circuit, for the purpose of enjoining the defendants from carrying on, or being directly or indirectly

engaged in the business of printing or publishing in the state of Michigan, so long as complainant should be engaged in that business at Ann Arbor, and from taking and receiving from the postoffice at Ann Arbor any letters addressed to said Chase, which should not have upon them a designation of the number of his private letter-box, or from interfering with their delivery to complainant; and from publishing or making sale, either directly or indirectly, of a book written by said Chase, known as "The New Book—Dr. Chase's Family Physician, Farrier, Bee-keeper, and Second Receipt Book." It is unnecessary here to notice the allegations of the bill further than to say, that they are appropriate to the state of facts shown by the evidence, so far as such facts warrant the relief asked.

Nor shall we enter into a discussion or analysis of the large volume of evidence in the record, and the particular reasons which have led us, where the evidence is conflicting, to the conclusions at which we have arrived; but we shall proceed to state the main facts and essential features upon which, in our view, the decision of the case must depend, as we find them established by the evidence.

Some fourteen years prior to the sale by Chase to Beal, presently to be mentioned, Chase had published a book, under the title of "Dr. Chase's Recipes; or Information for Everybody," which proved to be very popular, and the demand for which was very great.

For the first seven years after its first publication, the sale of this book had been made principally by Dr. Chase himself, traveling about the country for that purpose. But the sales becoming so large, and the profits so considerable, and the public demand still increasing, he had, several years prior to the sale to Beal, established in Ann Arbor a printing-house and bindery, in which the printing and binding of this book was carried on, and in connection with which he published a newspaper called "*The Peninsular Courier and Family Visitant*," and carried on the business of job-printing and binding, the establishment being known as "Dr.

BEAL v. CHASE.

Chase's Steam Printing-House," and as "The Courier Steam Printing-House." This business and the establishment in which it was carried on, at first comparatively small, had rapidly increased and grown larger in course of time, and by adding from time to time more presses, type, tools and apparatus, and enlarging the building in which it was carried on, the whole had become one of the best and most complete establishments in the Northwest, for the business of printing and book-binding; and beyond the printing and binding of Dr. Chase's books, enjoyed a large and increasing patronage, soliciting work from all parts of the state, as well as from abroad, and actually obtaining work from various parts, and a large portion of the state (though as yet none from the Upper Peninsula), and a considerable amount from other states. In the meantime the mode of selling his book had been changed. He no longer traveled himself for that purpose; but the books were furnished to persons in various parts of the country and in the various states, who chose to undertake the sale as traveling agents, or rather traveling book-sellers, who paid the money for the books at a wholesale price, before the books were taken or sent from the office, and mostly sent out to those persons upon orders sent by letter by them to Dr. Chase, accompanied with the money, or a draft, or postoffice order. Letters of this kind had become very numerous, and the sales unprecedentedly large, over three hundred and twenty-five thousand in all, having been sold up to the close of the year 1868, and about three hundred and seventy-five thousand when the sale was made to Beal; and, as stated over his own signature from time to time in his paper, to which he referred Beal when negotiating for the purchase, the total receipts of the office and business, including sales of the book, were, for the year 1866, about fifty-five thousand dollars, of which forty-seven thousand two hundred and fifty-four dollars and thirty-four cents was for the book alone; for the year 1867, total receipts were sixty-six thousand thirty-four dollars and sixty-eight

cents, of which fifty-seven thousand seven hundred and eighty-one dollars and thirty-six cents was for the book; and for the year 1868, the sales of the book amounted to about eleven thousand dollars less; but the other business of the establishment had so increased that the profits for the year were about the same. Letters in reference to the book, many of which contained money, drafts or postoffice orders, often amounted to from one hundred to one hundred and fifty per week, and brought in from three hundred dollars or four hundred dollars up to over one thousand two hundred dollars per week, much the larger portion of which was clear profit. The sale of the book was the great source of profit, and this book, together with his newspaper, and the prompt and excellent manner in which the job work of the office was done, had made Dr. Chase well known to, and popular with the public, and had given him and his establishment a high reputation, which attracted a large amount of business; so that, as he represented in his paper, to which Beal during the negotiation was referred for the facts, he was receiving orders from every section of the state, from Wisconsin and from Indiana, and all over the western states; still, as appears by the evidence, much the larger portion of the business was furnished from different parts of this state; and from considerable portions of which, and especially the whole Upper Peninsula, no orders had yet been received. The book was the main support, however, of the office, and, as he more than once intimated in his paper, but for that he could not have made the other branches of business very profitable at the prices for which his work was done. And for the last year the sale of the book had materially diminished, the country (with the exception of the southern states) having been pretty well canvassed; and the book had recently been offered to the trade (the regular booksellers) in many of the states, the sale by traveling agents being still continued as before.

Such substantially was the condition of the business

when, on the 30th of August, 1869, Chase sold out to Beal the printing and binding establishment and the business connected with it, the book (and two other books mentioned in the contract of sale) and the newspaper and its subscription list, as well as the lot and building where the business was carried on, the entire apparatus for printing and binding, and the good-will of the business. Some two years previous to this, however, some negotiations had been commenced between them in reference to a sale; an offer had been made by Chase to Beal, to sell for about thirty-seven thousand dollars, which Beal, after some days' reflection, concluded not to accept. But he still continued to watch the progress of the business with the view of making the purchase at some future time, believing it, as he expressed it, the best thing in Ann Arbor. And Chase, though he had greatly enlarged his office and increased the business, had in the meantime become anxious to sell.

Some days prior to the sale the parties met at Ann Arbor, and entered upon negotiations. Chase made representations of the nature and extent of the property and business, the success of the book, the profits of the book and business, which he represented to be large, and the business in a flourishing condition, extending generally over the state, and into adjoining states, as already noticed, and constantly increasing; and explaining the mode in which it was carried on and the book sold; which representations, Beal alleges in his bill, and testifies, were generally and in the main true. He enlarged upon the popularity the book had attained, its great usefulness, and the reputation he had acquired, and his establishment; and that this would be of great advantage to Beal should he make the purchase, and said that it would be likely to command the market for many years; and that no other book would be likely to come into competition with or supersede it. As a reason for wishing to sell out, he stated that he was getting advanced in years; his sight was getting poor, and his health failing; that he had now enough to live on, and wished

to retire from so arduous and extensive a business; and if he continued to do any business, should wish to get into a business more easily managed, and which would not require so much constant care and attention, and would be more manageable for a family like his; that if Beal should purchase him out, he would aid him in getting acquainted with and starting the business, and would, as Beal testifies, devote six months,—but as Chase testifies, three months,—to this end; spoke of the great amount of the letters and orders for the book, and for work to be done, which were continually being received, enclosing money, drafts or post-office orders, which would go into Beal's hands, and would continue to come for the book for years to come.

Finally, on Saturday, the 28th of August, 1869, the price and terms of payment were verbally agreed upon; the price was nominally sixty-five thousand dollars, of which thirty-five thousand was to be paid down in cash, and securities received as cash, and for the balance, thirty thousand dollars, Chase was to receive certain lands in Minnesota and certain real estate at Sauk Rapids, Minnesota, with a hotel upon it, and certain furniture and personal property; all of which Chase took at his own risk, as to value, having made such inquiries concerning it as he chose to make. And on Monday, the 30th of August, the parties went to the office of Mr. Gott, in Ann Arbor, to have the papers drawn and the necessary transfers made for carrying out the arrangement. The real estate of Chase in Ann Arbor was conveyed to Beal by a deed of Chase and wife, for the consideration (specified) of twenty-five thousand dollars; the proper conveyance made by Beal to Chase of the Minnesota property. The contract or instrument transferring the printing, publishing and binding, the newspaper, the book, etc., and the business connected with it, seems to have been the last instrument drawn, the details of which do not appear to have been in all respects previously specified and agreed upon. When this was partly drawn, Beal said that "of course Chase was not to go into business

again;" Chase replied that, "nothing has been said on that point;" to which Beal said: "Of course you are not; and it must be embodied in this paper." Chase then told Gott to insert, that while Beal should remain in the printing and publishing business in Ann Arbor, he, Chase, should not engage in it in Ann Arbor. But Beal not being satisfied with this, it was finally agreed that this restraining clause should be made co-extensive with the state, as it now stands in the contract. We mention this only because it is now insisted by the defendant's counsel, that there was no consideration for this restraining clause, aside from what had already been verbally agreed upon for the purchase, and that, therefore, there was no adequate consideration for this restraint upon Chase. But as there is nothing in the evidence tending to show that Beal would have consummated the purchase for the price given, without this stipulation, and it satisfactorily appears that he would not, we see no ground for any question of the adequacy of the consideration, if this provision is in other respects valid. Upon this question of consideration the case falls directly within the principle announced by this court in *Hubbard v. Miller, 27 Mich., 15,* and this point need not be further noticed.

The contract or instrument in which this restraining provision occurs, is in these words: "This agreement, made the 30th day of August, in the year of our Lord one thousand eight hundred and sixty-nine, between Alvan W. Chase of the city of Ann Arbor, in the county of Washtenaw, in the state of Michigan, and Rice A. Beal of the same place, witnesseth, that the said party of the first part grants, bargains, sells and conveys unto the said party of the second part (in consideration of the sum of forty thousand dollars to him in hand paid), the machinery, boiler, engine, presses, tools, furniture, and stock of whatever name or nature, in the building occupied by said Chase as his steam printing-office, and this day sold by him to the said party of the second part, together with all accounts for unfinished work on which payment has not already been

made; together with the subscription list of the *Peninsular Courier and Family Visitant*, and also the copyright of a book called 'Dr. Chase's Recipes, or Information for Everybody,' and also one other book called 'The Judd Family,' also a book called 'Reminiscences of a Voyage Around the World,' a copyright of which is to be hereafter obtained, together with the *good-will* of the *business of printing and publishing, and also the right to use the name of Dr. Chase in connection with said books*, all the stereotypes and electro-plate for said books now completed, and also the book-bindery, tools and stock, and all contracts for printing and publishing, together with all moneys to be hereafter received upon jobs or books unfinished. *And the said party of the first part also agrees, that while said Beal remains in said business of printing and publishing in Ann Arbor, he will not, either directly or indirectly, engage in the business of printing and publishing in the state of Michigan.*

"And the said Beal, on his part, if he chooses, may carry on said business, and he shall have the exclusive right, under the name of 'Dr. Chase's Steam Printing House,' and may add 'R. A. Beal, proprietor,' and he also agrees to fulfill all contracts heretofore entered into by said party of the first part for work, printing and advertising or publishing, and is to receive all moneys unpaid on said contracts. He is also to furnish the *Courier and Visitant* to all subscribers for the balance of their subscription year, and receive all unpaid subscriptions. All property belonging to workmen, and all books or papers left for binding, are excepted out of this sale; but it is intended to include all furniture, tables, desks and everything used to carry on said business of printing, publishing and book-binding. The party of the second part is also to have the privilege for one year of using the cistern and privy, on lot west of steam printing-house, for engine and hands of the building. Beal is to pay taxes assessed to Dr. Chase on the property this day conveyed to said Beal, real and personal, for the year 1869.

" The party of the first part also sells to the party of the second part his gray horse and establishment, purchased by him of Rev. H. S. White, including buggy, cutter and harness, saddle, bridle, buffalo robe, bells, etc.

" *Said Beal is to have the privilege of receiving the letters connected with said business, and opening the same.*

" Witness our hands and seals," etc.

Signed by CHASE and BEAL.

The papers were all executed and delivered on the 30th of August, and, on that day or the next, the parties went together to the postoffice, and Chase then publicly, in the presence of the clerks, told Col. Grant, the postmaster, that he had sold out his business to Beal, and every thing connected with it, and. that Beal was thereafter to have all his correspondence and money orders, etc., directed the postmaster to deliver to him all letters directed to him, Chase, including registered letters, for which Beal, he said, was authorized to receipt in his name, and that he was authorized to sign his name in all matters connected with the office and the business, that Beal was to have the postoffice drawer previously used by Chase in connection with his business; and he directed the postmaster to put all letters that came directed to him, or to the printing and publishing house, into that box for Beal, unless such letters bore on the face of them a direction to his own private box (which he said he would take), or the number of his residence, saying at the same time, that he was no longer Dr. Chase. This direction to the postmaster was in accordance with the parol understanding had between the parties during the negotiations, in which it was understood that Beal was to receive and open all such correspondence, and whenever he found a letter which pertained to Dr. Chase personally, and not to the business, he was to return it to Chase, or put it in his private box.

And Chase some time after this had a printed card and letter-head put on his private letters to his correspondents, stating that all letters intended for himself or family should

also have upon them postoffice box 351, otherwise they would go to his former printing house and be opened by strangers.

For about three years this arrangement relative to the correspondence seems to have been scrupulously adhered to, and the letters received, the larger portion of which were in reference to the sale of the book, which was principally sold in this way, amounted to from three or four per day up to thirty per day, a very large portion containing orders for the book, and money, drafts or postoffice orders to pay for them.    And among the letters thus received, addressed to Chase, not one in four or five hundred, if indeed one in a thousand, had reference to the private business of Chase, or any business except that sold to Beal.    And though the sale of the book had gradually somewhat declined, as the demand for it was being supplied, it was still very large, and the business of the printing and binding establishment was large, prosperous and profitable.

But in the meantime Doctor Chase had commenced writing, and was preparing for publication, a new book upon a somewhat similar plan, though containing none of the matter of the first book, and entitled (upon the title page) "Dr. Chase's Family Physician, Farrier, Bee-Keeper, and Second Receipt Book," and being desirous of publishing the same himself, and at Ann Arbor, where he resided, had consulted counsel as to the validity of the restraining clause in his contract with Beal, and had come to the conclusion that it was not legally binding upon him, and therefore, as he testifies, that he was under no obligation to abide by it.    He still, however, kept the entire consideration which he had received, and did not return or offer to return it, or any part of it.

But he met Beal, and proposed to purchase back the property, offering to pay in other property to the amount of some fifteen thousand dollars to twenty thousand dollars. Beal, however, asked seventy-five thousand dollars, and offered to sell for that.    Several interviews were had in

reference to it, but resulted in nothing. In one of these interviews Chase intimated for the first time, that his contract not to go into the printing and publishing business was not worth the paper it was written on, and that he had a right to go into the business in Ann Arbor, which, however, he said he should not do, as he had given his word. At length, however, in another interview, he told Beal, very decidedly, that unless he would sell out, he should go into business again; that though it would cost some money to start an office, there were men ready to help him who did not like him (Beal) better than he did. And Beal, having heard of the efforts of Chase to buy another printing establishment, and knowing or believing that there was not room for two such establishments at Ann Arbor, without such competition as would render them unprofitable, became alarmed and anxious to sell. But Chase was no longer inclined to purchase, but said that if he (Beal) had sold when he wanted him to, it would have been all right, but now he was in a better shape, and would not buy at all.

Chase thereupon soon after, in the latter part of July, 1872, rented a building, got in presses and printing material, began establishing the printing and publishing business, and had commenced setting type for the new book, when the association or corporation known as "The Ann Arbor Printing and Publishing Company" was formed, the articles of association for which are dated August 26, 1872, filed with the secretary of state August 28, and with the county clerk of Washtenaw on the 30th of August, 1872. This corporation was located at Ann Arbor. Its objects are declared to be, to do general printing and publishing business, to print, publish, bind and manufacture books, periodicals, newspapers, tracts, documents, and other publications. Its capital was to be fifty thousand dollars, divided into five hundred shares. The stockholders, with the shares taken by each, were declared to be as follows:

81 MICH.—64.

Alvan W. Chase ........................................ 250 shares.
James C. Watson ...................................... 200    "
Henry S. Dean ......................................... 15     "
Sedgwick Dean ........................................ 15     "
Zina P. King .......................................... 10      "
Henry Krause .......................................... 10      " ·

All of whom resided at Ann Arbor, and each was declared to be a director of the company. A president, vice president, secretary and treasurer were provided for. One-half the capital stock, twenty-five thousand dollars, was paid in, Chase putting in the stock and material of the printing house he had just commenced, as a part of his payment; and this was merged in the new company. Some of the stockholders had long been aware of the contract between Chase and Beal, and of the nature of the restraining clause in it, and all the others, with the possible (though to our minds not probable) exception of Krause, had notice of it before the corporation was fully completed or went into business, but concluded to take the risk of its invalidity.

Dr. Chase, who owned one-half the stock, was made president and superintendent of the company, and so remained when the bill in this case was filed. He was the only stockholder who had ever before been engaged in or carried on the printing or publishing business, though one other stockholder, Watson, had, when a boy, learned to set type, and he had been the author of some books, and contemplated the writing and publishing of others. The company also established and published a weekly newspaper, " The Ann Arbor Register," and entered upon the general printing and publishing business; their establishment in a short time, by the addition of presses, type and apparatus for the various branches of the work, rivaling that of Beal, though not equal in extent or capacity.

Dr. Chase, being still engaged in preparing his new book, which had been previously advertised to be completed by the 1st of December, 1872, but which was not yet com-

pleted, on the 3d day of April, 1873, entered into a formal written contract with the company, by which he purports to give to the company the exclusive right to publish this new book, during the term of its copyright; the company to publish the work in good style as soon as possible after receiving the manuscript, and at all times to keep a supply of it for sale, and use all reasonable efforts to advance its sale, and paying to him ten cents on each dollar of the retail price of all the books sold; and the new book was issued April 23d, 1873.

It is proper to say here that from the evidence, and all the circumstances of the case, Chase himself was the first to suggest and instigate the formation of this company, and was anxious for, and active in promoting its formation, though Watson was the most active member in actually effecting it. We are also entirely satisfied that the publication and sale of Dr. Chase's new book, the Second Receipt Book, which, from the unprecedented sales and great profits of his first book, it was believed would prove equally profitable, constituted the main inducement for the formation of the printing and publishing company, and that the stockholders believed the sale of this book would form the greatest and most reliable source of profit to this company, as the first book had to Dr. Chase's printing-house (since sold to Beal), and that, without this new book and the prospects of profit to be derived from it, this printing company would not have been formed.

But to return to the correspondence; the company having been formed, and about commencing, if it had not already commenced, the business of printing and publishing under his superintendence, Chase, on the 19th day of September, 1872, countermanded his previous direction to the postmaster, by the following letter:

"ANN ARBOR, Mich., September 19, 1872.
"*Postmaster, Ann Arbor, Michigan:*

"SIR—You will hereafter place all letters addressed to me in my box, unless there is something in the address of

the letter to indicate that it is intended for the publisher of
Dr. Chase's Recipes or the proprietor of Dr. Chase's Steam
Printing House.

(Signed)                    A. W. CHASE."

The first notice Beal had of this was, that from that
time he began to receive letters in reference to the book
and business of the office (addressed, as they all along had
been, to Dr. Chase) which had been opened by Chase, and
on which he had written Beal's name and put them in the
office. These letters mainly related to the first receipt book,
as formerly, asking for the book, seeking agencies, and
many of them containing remittances of money, drafts or
postoffice orders. But from about this time the number of
letters, the amount of remittances coming to Beal's hands
and the sale of the book began perceptibly to decline be-
yond any previous rate, and more and more rapidly as the
time passed on, a principal reason for which will appear
as we proceed to have been the use made by Chase of the
correspondence belonging to Beal, the circulars issued and
efforts made by Chase for the sale of the new or "Second
Receipt Book." In April or May, 1873, Chase ceased to
hand over to Beal even the letters containing orders and
remittances for the old book, but retained them, sending
the old book, however, when the order was express, but
sending also to these persons and to those agents who were
engaged in selling the old book for Beal, circulars describ-
ing and extolling the "New Receipt Book," inviting them
to undertake its sale as a more salable and a better and
more complete book, and likely to supersede the first re-
ceipt book. As a specimen, I here quote what Dr. Chase
says in one of the printed circulars sent out by him (purport-
ing to be superintendent of the printing company) to the
agents or persons known by him to be engaged in the sale
of the old book for Beal (and opening as he did all the
letters coming in his name pertaining to Beal's business
correspondence and agencies, he had every facility for as-
certaining the list of them), he says (after enumerating the

various contents of the new book): "And as no bookstore-man will buy even an old edition of a book after a new one is got out, then will not this rule hold good with an entire new book by the same author, which not only covers the ground of the old, but is fully four times as extensive, and contains entirely new matter, as compared with the first. Even those who have the old, ought to have the new." The circulars were headed "Dr. Chase's New Receipt Book. Circular to Agents."

The letters in which these circulars were sent out to those who had sent for the first or old book, and those engaged in the sale of it, were headed in print:

"A. W. Chase, President and Superintendent.

"J. C. Watson, Vice-President.

"Zina P. King, Secretary.

"Henry S. Dean, Treasurer.

"Organized August, 1872.

"The Ann Arbor, Printing and Publishing Company, publishers of Dr. Chase's Family Physician, Farrier, Bee-Keeper, and Second Receipt Book, issued April 23. Retail price, $2.00."

And as another specimen, and it is a specimen of the kind of efforts made to make the new book supplant the old, and to interfere with the proper business of Beal connected with the book sold to him, the following is a letter under the above letter-head:

"ANN ARBOR, June 3d, 1873.

"Mr. J. D. Brace:

"SIR—Your favor of the 1st is at hand. I sold out the old book nearly four years ago, and have in the last three years got out a second entirely new book, and as no book-store men want to buy an old book after a new one is out, you may feel the same way, at least the people here do. The enclosed circular gives prices and descriptive circular, and 'Register,' our newspaper, will give you an idea of the new book and its sale. We will wait your further orders, remarking, however, that we confine our men to·

one county only, and one county for each assistant. We sell in no other way. Respectfully,

"A. W. CHASE, *Superintendent.*"

Other similar letters were sent to parties who had enclosed a remittance for the old book, which was also sent.

This correspondence having relation to the book and business sold to Beal, though continued in the name of Dr. Chase, as it was understood and agreed it might be, it cannot be denied, was just as much the property and correspondence of Beal as if it had been carried on by Beal in his own name; and Dr. Chase had no more right to control it, or to avail himself of any benefit to arise from or information contained in it. And as by an express provision of the written contract, the validity of which is not disputed, Beal, and not Chase, was to have the right, not only of "receiving" but of "opening" the correspondence, we cannot doubt that if the position of the parties and the case had been reversed, and Beal had taken, and opened, and made use of, in the same way, correspondence belonging to Chase and pertaining to his business, Dr. Chase would readily have seen and felt the unfairness and injustice of such a course of conduct. But it will suffice to say here, that the natural and direct, if not also the necessary effect of this course of conduct in reference to the correspondence, as well as in getting up and establishing, and aiding to carry on a rival establishment for printing, publishing, binding, etc., was to lessen the sale of the receipt book which had been sold to Beal, and to diminish his business in all its departments, as well as its profits. And there is no room for doubt that Chase's conduct, in reference to the correspondence and the use he made of it, were purposely intended to have this effect, as respected the success and sale of the first book. The evidence tends to show the extent of the loss and injury thus caused.

And though the amount is not susceptible of accurate calculation, and can only be matter of probable estimate, the question being affected by so many considerations, and

the actual falling off in the receipts being in some small degree attributable to other causes, yet, upon a careful consideration of the testimony, and making due allowance for other causes of diminution of receipts, I think the loss or damage fairly traceable to the unwarrantable interference with the correspondence belonging to Beal, the still more unwarrantable use made of the information thereby obtained, and to the rivalry created, and the amount of business and profits diverted from Beal by the establishment of the printing and publishing company, cannot safely be placed below (if it is not in fact above) the sum found by the court below and fixed by the decree; and I see no reason for disturbing the amount thus fixed, if damages be allowable at all.

To proceed with the history of the case: Chase had, on the 19th of September, 1872, countermanded his directions to the postmaster, and taken possession of the correspondence, as already stated.

Beal, on the 17th day of October, 1872, filed his bill in the circuit court for the county of Washtenaw, in chancery, against Chase and the Ann Arbor Printing and Publishing Company, the principal object and only express prayer (for relief) of which was to restrain the defendants from printing and publishing the second or new receipt book, on the ground that the title of the book was an infringement upon the proprietary right of complainant to the copyright of the first book sold to him, and calculated and intended to lead the public to believe that the book about to be published was but a new, enlarged, and more complete edition of said first book. The bill, however, sets forth briefly, and with much less particularity than in the present bill, much, of the same matter found in the latter. The sale by Chase to Beal of the first book and the printing-house and business, the undertaking of Chase not to go into the printing and publishing business in the state, the agreement in reference to the correspondence, that Chase had "recently entered upon a plan to disregard and violate his said agree-

ment in relation to said sale and purchase," complainant's continuance in the business of printing and publishing, the organization of the printing company, which is charged to be a sham got up by Chase to evade the terms of his agreement, etc., the advertisements issued in relation to the forthcoming second receipt book, and the injury likely to result to complainant from this course of conduct; and praying, besides the specific relief asked, "such other and further relief as may be agreeable to equity and good conscience."

In pursuance of a previous order to that effect, the hearing of an application for a preliminary injunction on this bill was had on the 22d of October, and the motion was finally, on the 25th of October, denied by the circuit judge.

On the 4th of December, 1872, the defendants Chase and the printing company filed their separate answers, going over much of the same ground as their answers to the present bill. The case remained in this condition until the 14th day of July, 1873, when it was discontinued by the complainant, and the present bill was thereupon filed on the same day, and a preliminary injunction having been granted as prayed by the bill, two successive motions to dissolve the injunction were made by defendants upon affidavits, and heard by the judge, prior to the filing of an answer by either of them, both of which were denied.

The printing company filed its answer to the present bill August 5th, and defendant Chase, August 11, 1873.

In the meantime Chase had, on the 1st day of August (eighteen days after the filing of the bill), executed an instrument of that date, purporting, in consideration of twelve thousand five hundred dollars, to sell, assign and convey to the other members or stockholders of the Ann Arbor Printing and Publishing Company (in certain specified proportions to each) all his stock and all his rights as a stockholder, and his subscriptions for stock in said company, he to be kept harmless from any subsequent assessments on

the stock, which they agreed to do; and on the same day resigned the office of president and superintendent of the company, which the remaining board of directors accepted, he still, however, retaining his interest in the contract made with the company for publishing the new book.

This transfer (which Chase swears was made for the purpose of getting the book published by the company) is set up in the answer as a ground for denying the relief prayed by the bill; and two successive motions were made,—the first by the company for a dissolution of the injunction after its answer was filed and before that of Chase was filed, which was denied; the other, by both defendants, after the filing of Chase's answer, for the modification of the injunction, which was so far granted on the 4th of September as to permit Chase to take from the postoffice all letters addressed to him, unless there was something in the address of the letter to indicate that it was intended for the publisher of Dr. Chase's Recipes, or the proprietor of Dr. Chase's Steam Printing House; but the injunction was continued against all the defendants in all other respects, as prayed for by the bill. This the defendants seem to have found somwhat embarrassing, and all the remaining stockholders of the Ann Arbor Printing and Publishing Company, with one Franklin M. Chase, a nephew of Dr. Chase, organized a stock company at Toledo, Ohio, under the style of "The Chase Publishing Company of Toledo, Ohio," with a capital of ten thousand dollars, Franklin M. Chase, who was the book-keeper of the Ann Arbor company, being the secretary of this. This company was obviously and essentially the same, and under the same control as the Ann Arbor company, established for the sole and only purpose of publishing Dr. Chase's new book, which the Ann Arbor company had been restrained from publishing in this state, and doing no other business. And on the 30th day of September, 1873, the Ann Arbor Printing and Publishing Company, by an instrument of that date, purports to convey to the Chase Publishing Company all the

31 MICH.—65.

right of the former company in and to the agreement between it and Chase for the printing of the new or second receipt book; and upon this instrument Chase, on the 18th of November following, endorsed his assent to this transfer, and to the substitution of the obligations of the one company for those of the other, he holding himself under the like obligations to the new, as he had been to the old company; and the publication of the book has since been carried on at Toledo.

The case having been heard upon the pleadings and upon the proofs taken in open court, and submitted, the court, on the first day of June, 1874, rendered a decree disposing of a part of the cause, but reserving certain questions in the cause for further consideration. This decree, so far as rendered on the first day of June, was substantially that, (1) Chase be absolutely enjoined and restrained from carrying on, or being directly or indirectly engaged in the business of printing or publishing in the state of Michigan, so long as Beal shall remain in or continue to carry on the business of printing and publishing in the city of Ann Arbor; (and more specifically) from printing or publishing, or being directly or indirectly engaged or interested in printing or publishing, *in this state*, the second receipt book (specifying fully its title), so long as complainant shall continue to carry on the printing and publishing business in the city of Ann Arbor, and to print and publish the first receipt book, mentioned in the contract. But we do not understand this portion of the decree as aimed at or intended to affect any right of Chase as an author of the second receipt book or any other book; but merely to restrain him from the business of printing and publishing the book in this state.

2. The decree restrains the Ann Arbor Printing and Publishing Company from carrying on or continuing the business of printing or publishing in this state, *in connection with the defendant Chase*, or wherein said Chase shall be directly or indirectly engaged or interested, and (more

especially) from printing or publishing *in connection* as partners or otherwise *with said Chase,* or for his benefit in whole or in part, within the state, the second receipt book, so long as complainant shall remain in the business of printing and publishing in Ann Arbor, and shall continue to print and publish the first receipt book. But this decree would allow either Chase or the Printing and Publishing Company to go into the business of printing and publishing the second receipt book, whenever Beal should cease and give up the business of printing and publishing the first receipt book at Ann Arbor; and the decree is thus far less extensive than the restraining clause in the contract. It also leaves, as it ought, the Printing and Publishing Company at liberty at all times to publish the book in question, or any other book or paper on their own account, unconnected with Chase, whether Beal continues to publish the first receipt book or not.

After thus disposing of so much of the case as depended upon the validity of the restraining clause of Chase's contract, this first decree proceeds as follows:

"It is further in like manner ordered, adjudged and decreed that as to the letters in relation to said business in said contract in said bill mentioned, the injunction heretofore granted and issued in this case be and the same is hereby retained and held in full force and virtue as modified by this court on the 4th day of September, 1873, until the further order of this court, and that the question of damages and costs to be recovered by said complainant in this cause, as well as the changing or modifying of the said injunction in regard to the receiving of the letters aforesaid, and all questions involved in this case, not finally disposed of by this decree, be and the same are hereby reserved for the further consideration of this court."

From this decree the defendants Chase and the Printing and Publishing Company separately appealed to this court on the 24th day of June, 1874, the return of this appeal, with all the pleadings and proofs, being filed in this court

in July following.    This first appeal was. argued in this court in October last.    But in the meantime the circuit court, on the 16th September, 1874, proceeded by a further decree to dispose of the other questions in the case, the further .consideration of which had been reserved on the first of June.

This latter decree is in substance, that Chase and the Printing and Publishing Company, their counselors, attorneys, etc., do absolutely desist and refrain from taking or receiving from the postoffice in Ann Arbor any letter or letters received or that may be received at said office,. addressed to said Chase, which shall not have upon them a designation of the number of said Chase's private letterbox at said office; or in any manner interfering to prevent the delivery of the same to complainant, and from appropriating to his or their use any such letters, or any information therein contained, or any money, drafts or postoffice money orders, transmitted in or with any such letters, so long as complainant shall continue in the business of printing and publishing in said city of Ann Arbor.    And further, that said Chase and said company do pay to complainant, and that complainant recover of them, the sum of ten thousand three hundred and sixteen dollars and thirty-six cents, for the damages sustained by complainant after the making of the contract with Beal, and prior to the commencement of this suit, in consequence of the carrying on by the defendants of the printing and publishing business in the city of Ann Arbor, and the interfering with and withholding the letters and correspondence pertaining to said business, in violation of the rights of complainant, as stipulated in the contract between Chase and Beal, and that complainant recover his costs to be taxed;. that execution issue, etc.

This last decree was also appealed from, and was argued in this court at the January term—so that both appeals are now before us for disposition.

It is objected by the defendants that the second decree,.

or that disposing of the questions reserved upon making the first, is void, being made after the cause upon the first appeal was pending in this court; and reference is made to *section 5181, Comp. L. 1871,* which provides that upon the entering of such appeal "all further proceedings in the cause in the circuit court in chancery shall be stayed until otherwise ordered by the supreme court." But notwithstanding this statute, we have frequently entertained appeals from decrees which disposed only of a part or some particular branch of a cause; and any decree or order may be appealed from, which disposes of the rights of a party upon any independent branch of a case, even though the case, in some other of its phases, may not yet be ripe for a hearing. And we have never held, nor do I think it has been the understanding of the profession, that this statute prohibited any further proceedings in the court below, upon a separate and independent branch of the case, which could in no way affect the branch of the case covered by the appeal. Again, if the "further proceedings" prohibited by the statute were understood to include any other proceedings than such as might otherwise be taken by or at the instance of the parties, which I think may be questionable, still I can hardly think it was intended to prohibit a judge, who had heard a whole case, and had decided and made a decree upon a single branch of it, from taking further time to consider and dispose of other branches of it, in no way affecting the first. The object of the statute, I think, was, that the same question or subject matter should not be subject to litigation in both courts at the same time. It was not the fault of the appellee that the court did not decide the whole case at once, and make a decree upon all its branches at the same time, and he ought not to be made to suffer from this action of the court. And it would be the height of injustice to him to hold that he had lost the whole benefit of his bill, and of the litigation upon all branches of the cause not covered by the first decree, because the judge, without any agency of his, had

chosen to decide a part of it on one day, and a part upon
another.

At most, therefore, in any view, I think this action of
the court should be treated as a mere irregularity; and
justice requires either that the case should be sent back for a
rehearing or reconsideration as a whole, upon the same plead-
ings and proofs, to enable the court to make one complete de-
cree covering all branches of the case,—which we must
assume would be the same in effect as the two which we
now have; or we should overlook the irregularity, if it be
one, and treat the case as now before us upon both decrees
as one.    I think the latter the true course, and that it
would be idle ceremony and gross injustice to the appellee
to send it back.

We proceed, therefore, to the consideration of the case
upon its merits.

The first question arises upon the validity of the re-
straining clause in the contract.

It is objected that this is void; and upon this ground
defendant Chase, while retaining the large consideration that
was paid him for the property and business, deliberately
proposed to disregard his promises, and the other defendants
joined him in the attempt to build up a business that must
depend for its success on the substantial destruction of that
which Chase had sold and been paid for, and which he had
agreed not to compete with.    And this objection presents
for our consideration the principal point in the case, and
the one to which counsel directed their chief attention.

The precise ground of supposed invalidity is, that the
contract imposed upon Chase a general restraint of trade;
and this, it is said, is void by the ancient common law of
England, fully accepted and universally followed in this
country.    The restraint consisted in his binding himself
not to engage in the printing and publishing business any-
where in the state of Michigan, while Beal should continue
to carry on at Ann Arbor the business which was the sub-
ject of the contract.    The invalidity is supposed to be

shown by a great number of authorities to which our attention has been called, beginning with *Mitchel v. Reynolds,* *1 P. Wms., 181; 1 Smith's Leading Cases, 172,* where the doctrine relied upon first finds distinct expression. That case was debt upon a bond, conditioned that the defendant should not exercise the trade of a baker within a certain parish for the term of five years; and *Chief Justice Parker,* in delivering the opinion of the court, while holding the bond good, and the restraint upon trade to the extent imposed by it perfectly legal and unobjectionable, provided it was based upon sufficient consideration, went beyond the case to a general discussion of restraints of trade, and laid down rules which, though quite unnecessary in the particular controversy, have, with some modifications and qualifications, been accepted as law and followed from that time to the present. All general restraints upon trade he held to be void; and a restraint was said to be general within the meaning of the law, which extended to the whole kingdom. Apparently regarding all contracts in restraint of trade presumptively illegal, he nevertheless classifies them as follows: " Where the restraint is general, not to exercise a trade throughout the kingdom, and where it is limited to a particular place; for the former of these must be void, being of no benefit to either party, and only oppressive, as shall be shown by and by."—*p. 182.* And again he says such a restraint could " be of no use to the obligee; which holds in all cases of general restraint throughout England; for what does it signify to a tradesman in London, what another does at Newcastle? And surely it would be unreasonable to fix a certain loss on one side, without any benefit to the other. The Roman law would not enforce such contracts by an action." The ground of the invalidity, then, seems to be the impossibility that so broad a restraint could be of the least use or benefit to the party imposing it, in which case it is perfectly correct to speak of the contract as wholly oppressive, and in so far as it tended to deprive the public of the benefit that might be conferred

by the labor and skill of a citizen, it would be contrary to public policy. Again the learned justice says: "There is more than a presumption against it, *because it can never be useful to any man to restrain another from trading in all places;* though it may be to restrain him from trading in some, unless he intends a monopoly, which is a crime."—*p. 193.* And in conclusion he says: "In all restraints of trade, where nothing more appears, the law presumes them bad; but if the circumstances are set forth, that presumption is excluded, and the court is to judge of those circumstances, and determine accordingly; and if upon them it appears to be a just and honest contract, it ought to be maintained."—*p. 197.*

This case is the foundation of the rule relied upon; and the *dictum* of the learned judge most unequivocally shows that the reason for his opinion that a restraint co-extensive with the kingdom would be void, was the impossibility that one man could have an interest in a restraint so broad upon the trade of another. This decision was made more than a century and a half ago, and for a condition of things and a state of society wholly different from those which now prevail. It may have been quite true at that time, that to a person following any particular trade, profession or occupation in London, it would be wholly immaterial whether any other person was or was not following the same trade, profession or occupation in Newcastle, since the little business intercourse and the difficulty and delay of communication would wholly preclude any thing like competition between two persons in the same occupation thus circumstanced. But it cannot be said that the same fact is true any longer in England, or that it could be true of the state of Michigan to-day. In some occupations it is well known that rivalry and competition are active between professional men, artisans and merchants, located at extreme points, and that in some cases this competition may be quite as severe and effective at a distant point, as in the same locality where another is located. Indeed in some

cases where a single house is competent to supply all the demands of a state in its line, or where one manufactory would be fully equal to all its wants, the one establishment would not only have an interest in keeping out any other, but it would be interested to the whole value of its business, which the competition might render utterly worthless. If, therefore, we look only to the interests of the parties contracting, there would seem to be nothing in the reasons assigned by *Chief Justice Parker*, which should necessarily preclude a contract as broad as the one here disputed, provided the proper interest appeared to support it. .

It is said, however, that the public is a third party in such cases, and that the public is concerned to prevent such contracts, because:

1. They tend to prevent competition, which the public interest favors; and

2. They deprive the state of the services of a citizen by binding him to idleness or emigration.

As to the first ground, it may be said it is quite true the public are interested in competition in business; but this is not true under all circumstances nor to every extent. The public is quite as much interested in the prosperity of its citizens in their various avocations as it can possibly be in their competition. The latter may bring low prices to purchasers, but may also bring them so low that capital becomes unprofitable and business men fail, to the general injury of the community. If only one publishing house of large capital could be prosperous in the county of Washtenaw, the people of the county can have no interest in the investment of large capital in a second, and the sharper the competition the more unfortunate for the people, if ruin to the parties concerned must result. The illustration holds good for the state when the particular business competed with is of state interest and importance, for no community can be benefited by the competition of its members when it is carried beyond the bounds of a reasonable prosperity to the parties engaged in it. This is fully recog-

31 MICH.—66.

nized by *Chief Justice Parker* in *Mitchel v. Reynolds,* who assigns as one reason which may support contracts in restraint of trade, "that there may happen instances wherein they may be useful and beneficial, *as to prevent a town from being overstocked with any particular trade;* or in case of an old man, who finding himself under such circumstances, either of body or mind, as that he is likely to be a loser by continuing his trade, in this case it will be better for him to part with it for a consideration, that by selling his custom he may procure to himself a livelihood, which he might probably have lost by trading longer."—*p. 191.* If, then, their tendency to preclude competition may be a reason for denying validity to such contracts in some cases, their preventing it seems to have been found a sufficient reason for upholding them in others; so that competition seems not to be regarded as necessarily in itself beneficial, but as something which may or may not be beneficial according to the circumstances. And it may well be asked, who in general are the best judges of these circumstances; the parties concerned, who have an interest in making them the subject of their contracts, or the courts, who can obtain of the circumstances only such partial and unsatisfactory views as conflicting and imperfect evidence can give them?

As to the second ground, it must be conceded that the state has always an interest that none of its citizens shall be kept in enforced idleness. But when a contract only binds a person not to engage in a particular business within the state, is this consequence a necessary or even a probable one? It certainly might have been so in England in the days of *Chief Justice Parker,* when a system of apprenticeship prevailed which rendered it exceedingly difficult for one to obtain a living by his industry in any other avocation than that for which he had fitted himself by serving his time under its rules and under the law, but in this country at this time,—where a change of occupation is too common to excite remark; where merchants become manu-

facturers, and lawyers farmers, and farmers traders, not because they receive a consideration for doing so, but because with larger opportunities for observation than they had at first, they have fully satisfied themselves that such changes will be for their advantage, as oftentimes they prove to be, —any rule of law which should assume that one who for a consideration bargains not to follow his previous business, had thereby bound himself to idleness and penury, to the detriment of the state, would be a rule absurd in itself, and contrary to general experience and observation. On the contrary, where such a contract is the result of fair bargaining, the reasonable presumption is, that each party, in view of all the circumstances which were within his own intimate knowledge, was able to see how the bargain was to result to his advantage, and that the party resigning the business did not do so without being fully satisfied that he was receiving full equivalent, which would be more advantageous to him than the property and the business sold. And where a man has fully decided to sell his business to take up another, can there be any reason of state policy why he should be precluded from bargaining for the additional consideration he can obtain by agreeing not to engage in the same business? If a man can sell his business for ten thousand dollars only, but the purchaser will give twice as much in case the seller will agree not to engage in a ruinous competition with him, what interest has the public in denying to the seller the right of selling for this additional sum, or in releasing him from his bargain, if after he has received it he shall coolly repudiate this portion of his contract, while he keeps the consideration he has received for it? If there be any sufficient reason, it was not presented on the argument, and it is not hinted at in any of the cases to which our attention has been directed.

And it certainly can be no sufficient objection to such a contract, that it may possibly result in one party going beyond the state limits to engage in the same business anew.

What if it shall do so? Are our interests as a state so petty or exclusive, and our policy so narrow and invidious, that we frame rules to keep people within the state contrary to their inclination, or when it would be for their interest to go elsewhere? Yet this narrow, illiberal and exclusive policy must certainly be relied upon, if the tendency of a contract to induce a contracting party to leave the state is to defeat the contract. If such a' position is sound, then a contract made in this state for the services of a citizen at Chicago, or any other point outside the state, should be treated as void here, because depriving the state of the benefit that might flow from the industry of one of its citizens! Or to take a case still more exactly parallel: Partners in trade at Superior City might divide their stock, and one, for a consideration, agree that he would remove his share across the river to Duluth, and not again engage in the business at Superior City; but this agreement, though perfectly reasonable, considered with reference to the individuals only, would on this doctrine be void, because a state policy which has come down to us from semi-civilized or less enlightened times, when governments were accustomed to prohibit artisans from leaving the realm, and gold and silver from being exported, is supposed to be violated by the transfer of the industry and capital of a citizen across a river into another state. The position seems to us to require no further attention.

It may be well now to examine some of the later cases, to see if they have enlarged the reasons upon which the rule of law relied upon by the defendants was originally rested.

In *Davis v. Mason, 5 T. R., 120, Lord Kenyon*, in sustaining an agreement restraining one from practicing as a surgeon within ten miles of a certain town, dismissed the objection that it restricted competition, by saying, that the public were not likely to be injured by an agreement of this kind, since every other person was at liberty to practice as a surgeon in the town. In *Homer v. Ashford, 3 Bing.,*

*326, Best, Ch. J.*, in passing upon a contract of partial restraint, says: "The law will not permit any one to restrain a person from doing what the public welfare and his own interest requires that he should do.   Any deed, therefore, by which a person binds himself not to employ his talents, his industry or his capital in any useful undertaking in the kingdom would be void, *because no good reason can be imagined for any person imposing such a restraint on himself.*   But it may often happen (and the present case is a strong instance of it), that individual interest and general convenience render engagements not to carry on trade, or to act in a profession, in a particular place, proper. Manufactures or dealings cannot be carried on to any great extent without the assistance of agents and servants.   These must soon acquire a knowledge of the manufactures or dealings of their employers.   A merchant or manufacturer would soon find a rival in every one of his servants if he could not prevent them from using to his prejudice the knowledge acquired in his employ.

"Engagements of this sort between masters and servants are not injurious restraints of trade, but securities necessary for those who are engaged in it.   The effect of such contracts is to encourage, rather than to cramp the employment of capital in trade, and the promotion of industry."

Here is the same recognition of the fact, that competition is sometimes injurious, which we find in *Milchel v. Reynolds*, and here also we see that the public interest, which is to render the contract void, is not any general public interest irrespective of the interest of the parties, but an interest that no one shall be restrained in his own proper action where benefit can possibly result to no one from the restraint.

In *Horner v. Graves, 7 Bing., 735*, an agreement that a moderately skilled dentist would abstain from practicing over a district two hundred miles in diameter, was held void on the express ground that the extent of territory covered by it was beyond what, in view of the local char-

.acter of the business, could be reasonable. And *Tindal, Ch. J.,* said: "We do not see how a better test can be applied to the question, whether reasonable or not, than by considering whether the restraint is such only as to afford a fair protection to the interest of the party in favor of whom it is given, and not so large as to interfere with the interests of the public. Whatever restraint is larger than the necessary protection of the party can be of no benefit to either, it can only be oppressive; and if oppressive, it is, in the eye of the law, unreasonable. No precise boundary can be laid down within which the restraint would be reasonable, and beyond which excessive."

In *Ward v. Byrne, 5 M. & W., 547,* the rule by which all the court proposed to try the reasonableness of a restraint upon trade was, whether it was only co-extensive with the interests of the person with whom the contract was made.

In *Mallan v. May, 11 M. & W., 667,* a contract excluding a dentist from practice in the city of London, then containing a population equal to more than two-thirds that of this state now, was sustained, the court again measuring its reasonableness by the interest of the party contracting for the restriction, and declaring that "it would be better to lay down such a limit as under any circumstances would be sufficient protection to the interests of the contracting party, and if the limit stipulated for does not exceed that, to pronounce the contract to be valid." How this can be reconciled with a rule which under all circumstances would confine the restriction within the limits of state boundaries, it is impossible for us to understand. Such boundaries have little or no relation to the range of many kinds of business; for trade heeds not the mathematical lines by which state limits are indicated, but follows everywhere the law of demand and supply, unless unfriendly statutes interpose.

*Lord Langdale,* in *Whittaker v. Howe, 3 Beav., 383,* expressly repudiated the doctrine that a general restriction extending to the whole kingdom was to be held under all

circumstances unreasonable. The contract in question imposed upon attorneys and solicitors who had sold their business, a general restraint from taking it up again. This learned judge treated the question involved as one of reasonableness, considered from the standpoint of the contracting parties; and declaring his concurrence with the court of common pleas in Horner v. Graves, that in such cases no precise boundary could be laid down, but that the circumstances of the particular case must determine it, he accepted and adopted the words of Lord Kenyon, in Davis v. Mason, 5 T. R., 118: "I do not see that the limits are necessarily unreasonable, nor do I know how to draw the line." An injunction was therefore awarded to restrain a breach of the agreement.

Some question has been raised upon this case of Whittaker v. Howe, and it is said it cannot stand with the other authorities. If those which declare a restriction co-extensive with the state to be void are to be understood as laying down an inflexible rule, then it certainly cannot stand with them; but if they are to be understood as giving only an illustration which in most cases will sufficiently indicate the unreasonableness of a restraint, then it may well stand with them, if the reasons upon which it is based are the same which other cases have applied to different circumstances. And that the reasons are precisely the same, has already been seen. Those reasons were applied again by Lord Campbell in Tallis v. Tallis, 1 El. & Bl., 391, 18 E. L. & E., 151, in which a covenant not to engage in the book-canvassing trade in London, or within one hundred and twenty miles of the general postoffice, nor in Dublin or Edinburgh, or within fifty miles of either, nor in any town in Great Britain or Ireland in which the covenantee or his successors might at any time have an establishment, or might have had one for six months preceding, was held not to be unreasonable. Here was a restriction which, considering the territory covered by it, was more extensive than that which these defendants question; and, considering the pop-

ulation to be supplied, was many times as extensive, and the business was analogous to that which was here restrained. Would it not, therefore, be absurd to say that the restriction in this case must be considered unreasonable because it embraced the whole state, but that the one in that case must be held reasonable because certain corners of a much more extensive and populous country might possibly be left open to occupancy by the covenantor? *Lord Campbell,* reviewing the earlier authorities, justly remarks, that " the law relating to contracts in restraint of trade has been altered by late decisions; and that, while in *Mitchel v. Reynolds* they were held *prima facie* bad, according to the tenor of the later decisions the contract is valid unless some restriction is imposed beyond what the interest of plaintiff requires; and his interest has been considered to extend very widely."

And he makes remarks in the case, which apply with great force to the defendant in this case, Chase, who, having obtained a large sum on the sale of a business which he represented as extending to the whole state and much beyond it, now turns around, and, on evidence that his representations were too large, and on the pretense of regard for some principle of state policy which is to be subserved by his breach of contract, seeks to retain the consideration, while repudiating the promise on which he obtained it. " The facts of the case," he says, " are strong to show that the general rule may be well applied in respect to the present defense. The defendant   *   *   *   was probably acquainted with the business to which the covenant relates. He stipulated for and obtained a large price for consenting to the restriction; and, as far as we can perceive, he is endeavoring to keep that price without making the return for which it was paid; and he is attempting to support this proceeding on the ground that the public interest would be sacrificed if his publications are not brought out. *It is clear there would be evil if the law justified such a breach of contract,* but it is by no means clear there would

be any compensating good to the public from the publications intended by the defendant to be so made in violation of his promise to the plaintiff."

The true rule, it seems to us, is laid down with great clearness and accuracy by the vice chancellor in *Leather Cloth Co. v. Lorsont, Law R., 9 Eq., 345, 353*, in which, referring to the argument that a general restraint extending to the whole kingdom is on its face bad, he says: " I do not read the cases as having laid down that unrebuttable presumption which was insisted upon with so much power by " [counsel]. " All the cases, when they come to be examined, seem to establish this principle: that all restraints upon trade are bad, as being in violation of public policy, unless they are natural and not unreasonable for the protection of the parties in dealing legally with some subject matter of contract. The principle is this: public policy requires that every man shall be at liberty to work for himself, and shall not be at liberty to deprive himself or the state of his labor, skill or talent, by any contract that he enters into. On the other hand, public policy requires that when a man has by skill or by any other means obtained something which he wants to sell, *he should be at liberty to sell it* in the most advantageous way in the market; and in order to enable him to sell it advantageously in the market, it is necessary that he should *be able to preclude himself from entering into competition with the purchaser.* In such a case the same public policy that enables him to do that, does not restrain him from alienating that which he wants to alienate, and therefore enables him to enter into any stipulation, however restrictive it is, provided that restriction, in the judgment of the court, is not unreasonable, having regard to the subject matter of the contract."

Precisely the same rule is laid down in *Morse Twist Drill & Machine Co. v. Morse, 103 Mass, 73, 77*, which was the case of a restriction not confined within any territorial limits, and in which other recent English cases to

the same effect are referred to. And *Chapman, Ch. J.*, well remarks: "In this country there are periodical publications that have a very wide circulation, and it is obvious that a purchaser of the proprietorship cannot afford to pay the full value, unless he can obtain from the vendor a valid restriction against competition, which restriction shall be as extensive as his interest requires, *though it may cover the whole of a state, or the whole country.* The same would be true as to some books. For example, the author of a popular school-book could not sell its proprietorship for its full value, unless he could bind himself not to prepare another book which should be used in competition with it. The same would be true as to some manufactured articles. The present case furnishes an illustration. The defendant could not have obtained the consideration which was paid him, if it had been understood that this contract which he has violated had no validity. *He is appropriating to himself a part of that which he has sold to the plaintiff*, and which is valuable property to them."

And the same general view was taken by the supreme court of the United States in *Oregon Steam Navigation Co. v. Winsor, 20 Wal., 64,* in which it was expressly declared that state limits are no proper tests of the reasonableness of a contract in restraint of trade, and that much latitude must be allowed to the judgment and discretion of parties who bargain for the restraint in view and with an intimate knowledge of their own business interests. And a restraint was held valid in that case, though it embraced the whole territory of a state, and even more than that.

We do not deem it important to examine the cases further in detail. It is manifest that if it could fairly be regarded for the interest of Chase, when he made this contract, to consent to this restriction, because of a greater ability to sell at a good price if he would do so, and for the interest of Beal to insist upon it, because it would protect him against the competition of Chase and give him a more reasonable prospect of business success, then the

restriction cannot be held void without disregarding all the authorities which rest upon any sound principle. And we think there is every reason for holding that presumptively it was for the interest of both parties to agree upon the restriction which was expressed in their contract. The one made a sale for a greater price by this means, and the other protected himself against a competition which the evidence in this case shows might easily have become ruinous.

And the best possible evidence that it was for the interest of both parties to make the contract, is, that they deliberately made it, and probably at the time with the full intention of observing it. Certain it is, that it was faithfully kept for a time. What induced Chase afterwards to advance step by step in its violation, it is needless to speculate; we have only to determine whether his conduct was in disregard of the law; and we are clearly of the opinion that it was. And we are also of opinion, that in view of his representations and his contract, he is estopped from denying that the business he sold was co-extensive with the state.

That the defendant corporation is liable to complainant to the full extent that Chase is, would seem to be clear, unless the fact that Krause testifies to an ignorance of the contract on his part when he became a corporator, should be found an important circumstance. The other corporators knew about the contract, consulted about it, made up their minds it could not be enforced, and deliberately concluded to take the risk. They cannot complain, therefore, if, having thus voluntarily participated with Chase in a deliberate injury to the complainant's business, they are left to share with him the consequences. Had defendants constituted a partnership, instead of a corporation, the joint responsibility of all would have been clear, and notice of the contract to one would have been notice to all. It is insisted, however, that no such rule can be applied to cor-

porators, and the absurdity of holding a railroad corporation, for instance, chargeable with notice of any thing that may be known by any person who may buy a share of its stock, is forcibly pressed upon our attention. Such a case has little, if any, analogy to the present. This is the case of six men who unite in a business usually carried on by partners, who meet and consult, and talk over their plans as partners are accustomed to do, but who avail themselves of a corporate organization, not as a necessity, but as a possible convenience. Among the things talked over, and probably the most important of all, is the existence of this contract. All but one admit it to have been the subject of their consultations, and if Chase failed to apprise that one of it, we can only say he was wanting in that good faith to an associate which was obviously incumbent upon him. Now it is not denied that, had the organization assumed the form of a partnership, Krause would have been charged with constructive notice. To hold that he is not so charged because, for the convenience of the business, the organization was made to assume a corporate form, is to base an important distinction on what seems to us a wholly immaterial circumstance. The probability that Krause would have notice in fact, is the same in the one case as in the other; and the reason why the association, thus formed for a violation of the contract with complainant, should respond for the consequences, are not varied in the slightest degree by its taking on a corporate form rather than any other.

If Krause had innocently bought into the business afterwards, some other considerations would need to be discussed; but he was one of the original associates. The stock all remained in the hands of the original subscribers when the injury to complainant was committed, and it seems to us a manifest absurdity to hold that the neglect of his associates to lay before him a fact so important to their enterprise, when good faith to him required that they should do

so, should protect the association against the consequences of this deliberate violation of contract rights. Not assuming to lay down any general rule, but confining what we have to say to the precise facts of this case, we are of opinion that this corporation is and ought to be jointly responsible with Chase.

The defendants also insist that complainant lost his right to proceed against them by laches in commencing suit. Laches is a most important circumstance where parties are proceeding to expend money in reliance upon a supposed right, and upon the apparent acquiescence of the party who might question the right. But in this case defendants were misled by no acquiescence. They entered upon their undertaking in open and known hostility to the complainant, and in reliance, not upon his acquiescence, but upon their ability to defeat him in a legal contest. They knew from the very first that their position in respect to this contract must be antagonistic to that of complainant, and no consideration of good faith on his part could require that he should open the legal warfare at the very earliest opportunity. When a hostile attitude is thus taken, the challenged party may justly be expected, and reasonably be allowed, to be wary and deliberate in choosing his time and opportunity for attack. The delay in filing the present bill was less than a year from the organization of the corporation, and in the meantime a bill on a collateral branch of the controversy had been filed, and important action taken upon it. It is impossible, therefore, to hold complainant guilty of any laches which these defendants are in position to complain of. He might have moved sooner; but the law does not demand the utmost exertion of diligence in repelling a hostile invasion of one's rights thus deliberately undertaken with full knowledge of all the facts.

It is denied by defendants that the court had any power to award damages in the case; the question of damages being, they insist, peculiarly one for the consideration of

courts of law. In support of this position a number of English cases are cited, in some of which, decided since *Lord Cairn's Act (21 and 22 Victoria)*, which expressly authorized the court of chancery to give compensation in damages in some cases, it has been stated by the court that previous to that act chancery had no power to award damages. Whether these statements were meant to be understood literally, or whether, on the other hand, they were intended to be understood only as statements that previous to that statute the court had no power to grant relief in damages when no other relief was given, is not very clear, and perhaps not very important. Relief was certainly given in some cases in the English court of chancery by an award of damages, previous to the passage of that act; and there are decisions which even go so far as to hold that damages might be awarded in cases of specific performance, even though the principal relief sought was denied. The leading case of *Denton v. Stewart, 1 Cox, 258*, referred to in *1 Fonb. Eq., 43 et seq.*, which holds this doctrine, is overruled in England, the master of the rolls holding in *Greanaway v. Adams, 12 Ves., 401*, that where specific relief was denied, either because improper under the facts, or because it was impracticable, there was no basis for any relief in damages, and the party must be turned over to his remedy at law.—See also *Todd v. Gee, 17 Ves., 273. Denton v. Stewart* has sometimes been followed in this country.—See *Andrews v. Brown, 3 Cush., 134; Phillips v. Thompson, 1 Johns. Ch., 150;* but *Chancellor Kent* declined to follow his own decision, subsequently holding in *Hatch v. Cobb, 4 Johns. Ch., 559*, and again in *Kempshall v. Stone, 5 Johns. Ch., 193*, that the court ought not, except in very special cases, to sustain a bill for the award of damages merely. But in neither of these cases was the authority of the court, after granting the principal relief, to award damages where "it was necessary to do complete justice between the parties, denied or questioned; and its right, and indeed its duty to do so, instead of turning the parties over to a second

litigation, has often been declared in this country, in reliance upon what was believed to be the settled rule in England, irrespective of any statute. And the cases are by no means confined, as was argued by counsel, to those in which the award of damages would consist in an adjudication as to profits; but most of them are cases of specific performance, where the plaintiff established his right, but the defendant was unable to perform fully, or perhaps, after suit brought, had disabled himself from performing at all.

The right of the court to award incidental compensation where its jurisdiction is made out, is not, however, by these cases made to depend on the nature of the principal relief, but on the fact that the parties being properly before the court for one purpose, complete justice can be more easily, speedily and inexpensively done between them as to all the matters embraced in the suit, by the adjudication of the court of chancery being made to embrace them all, than by a decree as to a part, which dismisses the case with a view to a suit at law as to the remainder.—See *King v. Bardeau, 6 Johns. Ch., 38 ; Wiswall v. McGowan, 1 Hoff., 125 ; Same case on appeal, 2 Barb., 270 ; Cathcart v. Robinson, 5 Pet., 263 ; Climie v. Heale, 1 Munf., 63 ; Turner v. Dayton, cited in 1 Ohio, 130 ; Gibbs v. Champion, 3 Ohio, 337 ; Williams v. Champion, 6 Ohio, 170 ; Dustin v. Newcomer, 8 Ohio, 49 ; Jones v. Harrison, 3 Hayw., 92 ; Slaughter v. Tindle, 1 Litt., 358 ; White v. Hardin, 5 Dana, 141 ; Watham v. Oldham, 9 Dana, 50 ; Chapman v. M. R. & L. E. R. R. Co., 6 Ohio, N. S., 119 ; Doggett v. Hart, 5 Flor., 215 ; Martin v. Tidwell, 36 Ga., 332 ; Brown v. Gardner, Har. Ch., 291 ; Carroll v. Rice, Walker's Ch., 373.* These cases, and numerous others in which the same doctrine is incidentally recognized, were the warrant of the circuit court in giving complete relief in the case.

We now come to the question of the correspondence.

What is the fair meaning and extent of the covenant at the close of the contract, that " said Beal is to have the privilege of receiving the letters connected with said busi-

ness, and of opening the same?" This can only be understood by reference to the subject matter and the surrounding circumstances to which the covenant relates, the nature of the "said" business, the mode in which it was carried on, or was expected to be carried on, as well as the nature of the correspondence, and its connection with the business.

Chase had, by the same instrument, conveyed to Beal the whole printing, binding and publishing establishment and business, the first receipt book, the publication and sale of which constituted the principal source of profit and inducement to the purchase, the newspaper he was publishing, with its subscription list, and his right to two other books, together with the good-will of the business of printing and publishing, and the right to use the name of Chase in connection with said book and the publishing business, giving him also the right to carry on the whole business transferred, under the name of "Dr. Chase's Steam Printing House," and had required Beal to fulfill all contracts previously entered into by Chase. The correspondence had been and was mainly in reference to the receipt book and its sale, letters transmitting orders for the book and remittances in various forms to pay for it, as well as orders for work to be done in printing and binding. These letters, like the few Chase had been receiving which did not relate to the business, had nothing upon the outside to indicate whether they related to the business, or were private, or merely personal, having no reference to the business. Those thus directed, however, which did not relate to the business were extremely few in comparison with those which did, —not more than one in five hundred, if more than one in a thousand. Until opened it could not be known whether any particular letter was of the one class or the other, though the chances were five hundred or a thousand to one that they related to the business sold to Beal, and therefore belonged to him. One party or the other must have the right to open them and determine their character (unless some third person was agreed upon, which was not done).

This right was therefore very properly and necessarily given to Beal, who had so much the greater interest, and without which he could not safely carry on the business he had purchased. And though the contract does not express it in so many words, no one can doubt that the fair implication arising from this contract would be, that, if Beal on opening any letter should find that it did not relate to the business he had purchased, but to Chase personally, it would be his duty to hand it to Chase, or give it the proper directions to reach him. And it is entirely obvious also that Chase had it in his own power, and would naturally, like any other prudent man under like circumstances, take a private box, and notify most if not all his personal or private correspondents to address their letters to this box, or give the number of his residence, or in some other way to denote that it was intended for him personally; and this we accordingly find was precisely what he did.

In view of these considerations, I think it entirely clear that the order and directions given to the postmaster immediately after the sale, in reference to the delivery of the correspondence to Beal, and his right to take the same and its contents, to sign and receipt for the same in Chase's name, was no more than the fair result and just interpretation of the covenant in his own contract with Beal, and no more than by his contract he was bound to do. I cannot, therefore, consider it, as contended by the defendants, a mere voluntary license given by Chase, and to be revoked at his pleasure, nor even a new verbal contract, but a part, and a very essential part, of the property rights conveyed by Chase to Beal, which he had no more right to revoke than he had to revoke the sale of the printing presses, or the real estate sold at the same time, and as a part of the same transaction.

It seems to me, therefore, clear, whatever view might be taken of any other question in the case, that the complainant is entitled to a decree for carrying this portion of the contract into full effect, and to an injunction restraining

Chase, and all persons acting or claiming to act under his authority, from taking such correspondence from the postoffice.

The decree as rendered in the court below ought to be slightly modified in this regard, so that the injunction shall not restrain or prohibit Chase from receiving from the postoffice such letters coming or to come to this office to his address, as may have upon the outside or envelope the number of his residence, or any other mark or word clearly indicating that the same is intended for Chase personally, unconnected with the business sold to Beal, as well as those having upon them the number of his private postoffice box, with the further provision, however, as a part of this modification, and upon the same principle that a decree for the execution of a deed or release is granted by courts of equity, that the defendant Chase should be decreed to execute and deliver to Beal a written order, directed to the postmaster, requesting him to deliver all such correspondence (not specially addressed in one of the three modes just above indicated), authorizing Beal to receipt for the same and for any of the contents, and to sign Chase's name to any proper receipt to the postmaster for money, drafts, registered letters, postoffice money-orders, and other remittances enclosed in, or pertaining to any such correspondence in reference to the business so sold to Beal; but such written order to the postmaster expressly to except all letters addressed to Chase, having upon the outside or envelope the number of his private postoffice box, or the number of his residence, or any other mark or word clearly indicating that such letter is intended for Chase personally, or that it is not connected with the business so sold to Beal. In all other respects the decree of the court below should be affirmed, and the complainant should recover his costs in both courts.